**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DOUGLAS T. LAKE,

Defendant - Appellant,

------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID C. WITTIG,

Defendant - Appellant.

No. 06-3140

No. 06-3141

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 03-CR-40142-JAR)**

Seth P. Waxman, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, Washington, DC, for Defendant - Appellant Douglas T. Lake, Steven Alan Reiss, Weil, Gotshal & Manges LLP, New York, New York, for Defendant - Appellant David C. Wittig, (Edward C. DuMont, Theodore D. Chuang, Demian S. Ahn, Michael P. Spence, Daniel S. Volchok, Wilmer, Cutler, Pickering, Hale & Dorr, Washington, DC, on the brief for Defendant - Appellant Douglas T. Lake, and Gregory S. Coleman,

Lisa R. Eskow, and Edward C. Dawson, Weil, Gotshal & Manges LLP, Austin, Texas, on the brief for Defendant - Appellant David C. Wittig).

Richard L. Hathaway, Assistant United States Attorney (Eric F. Melgren, United States Attorney, Christine E. Kenney, Assistant United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff - Appellee.

_____

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

_____

**HARTZ**, Circuit Judge.

_____

The defendants, David C. Wittig and Douglas T. Lake, came to Kansas from Wall Street investment banks to run the state's largest public utility, now known as Westar Energy, Inc. The government convinced the jury in this case that the two men had conducted a far-reaching scheme to milk the company for all they could through a pattern of fraud and deceit. But the prosecution hung by a thin legal thread. Despite the scope of the alleged fraudulent scheme, all the counts of the indictment depended on proving the efforts of the defendants to conceal from the United States Securities and Exchange Commission (SEC) their personal use of corporate aircraft. The attempt to prove concealment was flawed, however, because the government produced no evidence that the defendants failed to comply with SEC regulations governing the reporting of such personal use and the jury was never instructed regarding the SEC's reporting requirements. As a

result, we must set aside the convictions on every count, most of which cannot be retried.

The indictment charged 7 counts of wire fraud, 17 counts of money laundering, 14 counts of circumvention of internal financial controls, and 1 count of conspiracy to engage in these substantive offenses. A fortieth count sought forfeiture of the fruits of the alleged offenses. The offense of wire fraud requires a scheme to defraud and the use of an interstate wire communication to further the scheme. Each wire-fraud count alleged the wire transmission to the SEC of a different required report. Transmission of a required report can serve as the predicate for a wire-fraud offense only if the report is itself false or fraudulent. The government alleged that the reports were deceptive because they failed to disclose the great value to the defendants (about $1 million each) of their personal use of corporate aircraft. But SEC regulations require reporting only the additional cost to the corporation incurred as a result of the corporate officer's personal travel, and then only if the total additional cost exceeds a certain threshold per year for the officer. The government offered no evidence that the additional cost to Westar of either defendant's personal travel ever exceeded this threshold; indeed, it offered no evidence of the additional cost to Westar for any of the personal trips. Therefore, the jury could not possibly determine that the reports, which disclosed no personal travel by the defendants, were false.

Consequently, we must reverse the wire-fraud convictions because of insufficient evidence. Further prosecution of these charges is barred by the Double Jeopardy Clause.

As the government properly conceded at oral argument, if the wire-fraud charges fall, then so must the money-laundering convictions. The money-laundering charges alleged that the defendants had used the fruits of their wire-fraud scheme to acquire various assets. If there was no wire fraud, there was no money laundering. These charges, too, cannot be retried.

As for the circumvention charges, they were based on the failure of the defendants to disclose their personal travel on corporate aircraft in various internal forms used to prepare reports for the SEC. The core issue with respect to these failures to disclose is the defendants' intent. They argued at trial that other Westar officers almost always failed to report such travel and that one could infer that they thought such disclosure was unnecessary. To counter this inference, the government offered evidence of the great value to the defendants of this travel (again, about $1 million each), making it unlikely that they would think it inconsequential. The defendants sought from the district court an instruction to the jury explaining that the proper consideration was not the value of the travel to the defendants but the (much lower) additional cost of the travel to Westar. The court refused to give the instruction. Because this instruction could easily have

-4-

influenced the jury in deciding whether the defendants' failure to disclose was with the requisite intent, we must also reverse the circumvention convictions, although without prejudice to a retrial.

Finally, given the dependence of the conspiracy charges on the evidence and instructions regarding the substantive charges, we must also reverse the conspiracy convictions and remand for retrial. The forfeitures likewise cannot stand. In light of our reversal of all the convictions on the above grounds, we need not address a number of other issues raised by the defendants regarding the conduct of the trial and their sentences.

## I.    BACKGROUND

We summarize the evidence at trial in the light most favorable to the jury's verdict. *See United States v. Espinoza*, 338 F.3d 1140, 1146-47 (10th Cir. 2003). In 1995 John Hayes, the Chief Executive Officer (CEO) of Westar (then known as Western Resources, Inc.), recruited Mr. Wittig (a New York investment banker who had performed services for Westar) to join Westar as Executive Vice President of Corporate Strategy to develop and implement a diversification plan for the utility. Mr. Wittig's original compensation included a salary of $425,000, a relocation benefit, stock, various short- and long-term incentives, and other benefits. By early 1999 Mr. Hayes had left Westar, the Board of Directors had appointed Mr. Wittig as President, CEO, and Chairman of the Board, and

Mr. Lake, also a New York investment banker, had joined Westar as Executive Vice President and Chief Strategic Officer.

The diversification strategy initiated in 1995 involved the acquisition of various unregulated businesses. In 1996-97 Westar attempted to acquire ADT, a national home-and-business security company. Although the acquisition ultimately failed, Westar made approximately $856 million purchasing and then selling ADT stock. In 1997 Westar acquired a home-security company, Protection One, and bought stock in Guardian International, a security-alarm business. Westar's stock price increased dramatically and between 1995 and 1998 its assets grew from $5.5 billion to $8 billion (although its long-term debt increased from $1.6 billion to $3 billion).

As Mr. Wittig replaced Mr. Hayes at the helm, however, the tide began to turn. In early 1999 accounting irregularities and an SEC investigation caused Protection One's share price to plummet. Westar's share price also fell sharply, from a high of almost $44 in 1998 to about $17 by the end of 1999.

Westar hired two investment banks to help restore shareholder value. They recommended that the regulated utility business be split from Westar's unregulated businesses and merge with another utility (the split-merge transaction). Westar's Board approved the proposal in 2000, the unregulated businesses were split from the utility to create Westar Industries, and the search

for a merger partner began.  But the Kansas Corporation Commission (KCC) in 2001 rejected the plan, scuttling a proposed merger.  It also ordered Westar to cut rates by $20 million (when Westar had been seeking a $150 million rate increase).  Westar's stock hit a low of near $9 per share in late 2002, about the time of the departures of Mr. Wittig and Mr. Lake.

Although at trial the defendants portrayed the diversification efforts as attempts to uplift and then save Westar, the government presented a far different view.  It contended that the efforts were the central feature of a wide-ranging scheme by the defendants to loot Westar.  The most ambitious prospect of the scheme was to collect huge sums ($37 to $65 million for Mr. Wittig and $18 to $35 million for Mr. Lake) from change-in-control provisions of their employment contracts that would be triggered by completion of the split-merge transaction.

A second component of the alleged scheme was profiting by Mr. Wittig ($6.1 million) and Mr. Lake ($2.9 million) from complex transactions in Guardian shares that caused a $4.2 million loss to Westar.  Also parts of the alleged scheme were acceleration of a $5.37 million signing bonus to Mr. Wittig that was to have been paid over a 10-year period beginning in 2010; improper payment of relocation expenses; improper loans from Westar; acquisition of a split-dollar life-insurance contract for Mr. Wittig at a far greater cost to Westar than the bonus it was ostensibly to replace; and personal use of Westar aircraft.  To

accomplish this looting, the defendants misled the Board of Directors and connived to remove two Board members who asked challenging questions (the two resigned voluntarily).

The defendants' personal use of Westar aircraft was of central importance to the prosecution's case. Mr. Wittig, Mr. Lake, and their families apparently flew on the aircraft on numerous personal trips. The flight logs, however, always listed the purpose of the trip as "business." To identify personal trips, the government had an accountant, John Meara, review the logs and select those trips on which (1) only a defendant's family members and non-Westar employees were passengers, (2) the flight took place over a weekend or holiday or the defendant's calendar noted a vacation, and (3) there was no business entry on the defendant's calendar within 24 hours of arrival. Personal use of the aircraft violated a Westar ethics policy that forbade personal use of corporate property in the absence of a policy allowing such use, although the defendants apparently were not alone in this violation. Evidence indicated that a number of other Westar executives (including Westar's general counsel) and directors flew family members on corporate aircraft between 1995 and 2002.

Federal law required Westar to submit annually to the SEC a 10-K Annual Report, *see* 17 C.F.R. § 249.310 (2002) and a 14A Proxy Statement, *see id*.

§ 240.14a-3 (2002).[1] The 10-K presents information about the company's finances, business activities, and management. *See* Form 10-K *available at* http://www.sec.gov/about/forms/form10-k.pdf (last visited Dec. 9, 2006). The 14A presents, among other things, information about the compensation for the CEO and the next four most highly compensated officers of the company. *See id.* § 240.14a-101 Item 8 (requiring information set forth in 17 C.F.R. § 229.402); *id.* § 229.402(a)(3) (persons for whom disclosure is required). Westar electronically submitted these reports to the SEC; they are available to the public. *See* 17 C.F.R. § 232.101(a)(iii) (2002). To assist him in preparing these annual filings, Westar's general counsel distributed to its directors and officers annual Director and Officer (D&O) questionnaires that requested the recipients to disclose all compensation they had received that year, including any personal benefits. Each questionnaire provided a nonexhaustive list of examples of "possible personal benefits," including home repairs and improvements, personal travel expenses, and personal use of Westar property, such as cars, planes, apartments, or vacation homes.

Mr. Wittig and Mr. Lake both failed to list their personal use of corporate aircraft as compensation on the D&O questionnaires. In this failure they had

---

[1]The 2002 versions of the cited regulations were in effect at all times pertinent to this case.

company.  Between 1995 and 2002, out of all the directors and officers to whom a D&O questionnaire was distributed, only Westar general counsel John Rosenberg in 1998 and Westar director R.A. Edwards in 2002 disclosed personal use of corporate aircraft.  Among those who failed to disclose personal use were Westar general counsel Rick Terrill and his assistant, and later successor, Larry Irick. Westar did not disclose any personal use of corporate aircraft in its SEC filings, even for Mr. Rosenberg and Mr. Edwards.

A central issue at trial was whether Mr. Wittig and Mr. Lake acted with wrongful intent in failing to report on the D&O questionnaires their personal use of company planes.  Highly pertinent to the assessment of that intent is whether the personal use had to be reported to the SEC.  The defendants asserted that SEC regulations governing the 10-K and 14A forms required disclosure of personal airplane use only if the "aggregate incremental cost" exceeded a certain threshold—the lesser of $50,000 and 10% of annual salary plus bonuses—and that their use did not meet this threshold.  The government argued that all compensation had to be disclosed, cash and noncash, regardless of the amount. But the government made no effort to inform the jury of what was specifically required by SEC regulations, contending that the regulations were irrelevant. Rather, it focused on the extremely high value of the personal trips.  Accountant Meara testified to the "charter value" of the trips, informing the jury of the cost

per hour of renting on the open market a similar plane for the trips. In calculating the charter value of the trips, he included the cost of "dead head" flights in which an empty plane returned to its base after delivering passengers or flew from its base to pick up passengers. He computed a total charter value for the period 1998 to 2002 of approximately $1 million each for Mr. Wittig and Mr. Lake.

To support its contention that Mr. Wittig's failure to report his personal travel was a willful violation of the law, the government offered evidence of two occasions on which he had directed nondisclosure. First, in 2000 Westar's chief financial officer (CFO) had discussed with Mr. Wittig the tax consequences of the personal airplane use and how the company should account for it. He informed Mr. Wittig that the corporation's tax department recommended that Westar begin imputing airplane use to the employees, so that the travel would be deductible to the corporation but taxable income to employees. Mr. Wittig decided that Westar would not change its policy.

Second, in 2001, when the KCC was scrutinizing Westar's split-merge plan, Arthur Andersen LLP, Westar's outside accounting firm, suggested to Westar's internal auditor, Jeanette Tryon, that she conduct an audit of corporate airplane logs. She met with Mr. Wittig to inform him of the audit and determine the location of the flight logs. Mr. Wittig told her that she was not to do the audit because the KCC would likely want the results. She informed Arthur Anderson of

the refusal, but it did not pursue the matter with her during her remaining brief time with the company. A day or two after her conversation with Mr. Wittig, the CFO offered Ms. Tryon an attractive (but voluntary) severance package although she had been told just a few weeks earlier that the company wanted her to stay despite layoffs in her department. She accepted the package and left soon thereafter.

Mr. Wittig and Mr. Lake were indicted in December 2003 in the United States District Court for the District of Kansas. In the superseding indictment seven counts charged both men with wire fraud. *See* 18 U.S.C. § 1343. Each count alleged the above-described scheme to loot Westar; the counts differed only in that each alleged a different wire transmission: four 10-K Annual Reports (one for each year from 1998 through 2001) and three 14A Proxy Statements (one for each year from 2000 through 2002). Seventeen money-laundering counts charged the defendants with having engaged in monetary transactions in criminally derived property. *See id*. § 1957. Seven of these counts were based on transactions of Mr. Wittig at Capital City Bank—namely, increases in his line of credit and subsequent draws on that line of credit secured by property obtained through the wire fraud. The other 10 money-laundering counts alleged sales of Westar stock obtained through the wire fraud. Fourteen counts charged the defendants with having circumvented internal financial controls. *See* 15 U.S.C.

§§ 78m(b)(5) & 78ff. Thirteen of these alleged that the defendants had circumvented internal controls by failing to report personal use of corporate aircraft on 13 different annual D&O questionnaires for Westar, Westar Industries (a subsidiary of Westar), and Protection One. (Mr. Wittig did not fill out anything in the 2002 D&O reports for the three corporations.) The remaining circumvention count alleged that Mr. Wittig had circumvented internal controls by prohibiting Westar's internal auditor from performing an audit of corporate aircraft use. The conspiracy count charged the defendants with having conspired to commit wire fraud, money laundering, and circumvention. Finally, the fortieth count of the indictment sought forfeiture of everything each had acquired as a result of the conspiracy, wire-fraud scheme, and money laundering. *See* 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

The defendants' first trial ended in a mistrial on December 20, 2004, because the jury failed to agree on a verdict. *See United States v. Wittig*, 425 F. Supp. 2d 1196, 1204 (D. Kan. 2006). They were retried six months later. *See id.* At the close of the government's evidence, Mr. Wittig and Mr. Lake moved under Fed. R. Crim. P. 29(a) for a judgment of acquittal. The district court reserved its ruling; and the jury found Mr. Wittig guilty on all counts and Mr. Lake guilty on 30. The jury decided that many, but not all, of the assets listed in the forfeiture count should be forfeited. After the verdict Mr. Wittig and Mr. Lake renewed

their motions for acquittal and alternatively sought a new trial. The district court denied both motions.

The district court sentenced Mr. Wittig to 18 years' imprisonment, fined him $5 million, and ordered him to pay restitution of almost $14.5 million. It sentenced Mr. Lake to 15 years' imprisonment, fined him $5 million, and ordered him to pay restitution of about $2.8 million.

## II. DISCUSSION

### A. Wire Fraud

The wire-fraud statute, 18 U.S.C. § 1343, states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, *transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds* for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

(emphasis added). The statute tracks language of the mail-fraud statute, *id*. § 1341, substituting the italicized language above for the language italicized below in the mail-fraud statute, which states in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so, *places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal*

*Service . . .* shall be fined under this title or imprisoned not more than 20 years, or both.[2]

(emphasis added). Interpretations of § 1341 are authoritative in interpreting parallel language in § 1343. *See Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005).

The elements of the offense of wire fraud in this case are (1) a scheme to defraud, (2) an interstate wire communication, and (3) a purpose to use the wire communication to execute the scheme. *See United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998). The third element is the central dispute on this

---

[2]The entire text of § 1341 is:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

appeal. In other words, were the wire communications "transmitted . . . for the purpose of executing [the] scheme"? 18 U.S.C. § 1343.

The wire communications that allegedly violated § 1343 were seven filings of reports with the SEC: 10-K Annual Reports for 1998 to 2001 and annual 14A Proxy Statements for 2000 to 2002. The defendants contend that the third element was not established at trial because these reports were required by law and the government failed to prove that they contained anything false. We agree.

Corporations are required by law to file both the 10-K report, *see* 17 C.F.R. § 249.310(a) (Form 10-K shall be used for annual reports required by 15 U.S.C. §§ 78m or 78o(d)); and the Schedule 14A, *see* 17 C.F.R. § 240.14a-3 (information specified in Schedule 14A must be provided to persons whose proxies are solicited); *see also* 15 U.S.C. § 78n(a) (issuers wishing to solicit proxies must follow rules prescribed by SEC). As we shall explain, the government failed to show that there was anything false or fraudulent about any of the reports upon which the seven wire-fraud counts rested. As far as the trial evidence showed, even in the absence of a fraudulent scheme the seven reports would have been filed and the contents would have been the same. In this circumstance, one cannot say that the wire transmissions were "for the purpose of executing [the] scheme." The reports were filed because they had to be, not because of any unlawful scheme. Of course, a filing required by law could be used to further a

scheme if it was itself false or fraudulent; but the government did not show that there was anything misleading in the reports. Consequently, we cannot see how their filing advanced the alleged fraudulent scheme or how one could say that the defendants' purpose in filing them was to advance the scheme.

This is an easier case than *Parr v. United States*, 363 U.S. 370 (1960), in which the Supreme Court found no violation of the mail-fraud statute. The scheme in that case was the misappropriation of school-district funds for the personal benefit of the defendants. The mailings, including "letters, tax statements, checks and receipts," were all "legally compelled mailings" related to the assessment and collection of taxes by the school district. *Id.* at 389. The taxes collected, of course, were the source of the funds that were then misappropriated. There could be no doubt that the collection of tax money was necessary to accomplish the defendants' scheme; after all, if no taxes were collected, there would be no money to misappropriate. Nevertheless, in setting aside the convictions the Court wrote:

> [W]e think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys.
>
> Nor, in the light of the facts in this record, can it be said that the mailings . . . constituted false pretenses and misrepresentations to obtain money.

*Id.* at 391-92.  As summarized in *Schmuck v. United States*, 489 U.S. 705, 713 n.7 (1989):

> [*Parr*] held . . . that in the absence of any evidence that the tax levy was increased as part of the fraud, the mailing element of the offense could not be supplied by mailings "made or caused to be made under the imperative command of duty imposed by state law," 363 U.S. at 391. . . .  [T]he mailings of the tax documents in *Parr* were the direct product of the school district's state constitutional duty to levy taxes . . . and would have been made regardless of the defendants' fraudulent scheme . . . .

Most other circuits to address the issue have interpreted *Parr* to hold that "mailings of documents which are required by law to be mailed, and which are not themselves false and fraudulent, cannot be regarded as mailed for the purpose of executing a fraudulent scheme."  *United States v. Curry*, 681 F.2d 406, 412 (5th Cir. 1982); *see United States v. Cross*, 128 F.3d 145, 149-52 (3d Cir. 1997); *United States v. Gray*, 790 F.2d 1290, 1298 (6th Cir. 1986), *rev'd on other grounds sub nom. McNally v. United States*, 483 U.S. 350 (1987); *United States v. Boyd*, 606 F.2d 792, 794 (8th Cir. 1979) (alternative holding).  A divided panel of the Seventh Circuit did not read *Parr* so broadly, *see United States v. Green*, 786 F.2d 247, 249-51 (7th Cir. 1986), but we think that the dissent in that case had the better of the argument.  Not only did the *Green* majority opinion adopt an unconvincingly crabbed interpretation of *Parr*, but it failed to explain how a nonmisleading mailing compelled by law can be for the *purpose* of furthering a fraudulent scheme.  As the dissent pointed out, "So far as appears, [the defendant]

-18-

mailed [the notices that were the predicate for the mail-fraud charges] only because it was his official duty. . . . If he hadn't mailed the letters he would have been fired." *Id.* at 255. In any event, even under *Green,* "the government [must] prove that legally-required mailings were important to the successful execution of the fraud," *id.* at 250, and there was, as we shall see, no such proof in this case.

We now explain why the seven filed reports were not false or fraudulent, at least as far as the trial evidence shows. We note that the district court incorrectly instructed the jury that the truth of the reports was irrelevant, *see* Aplt. App. Vol. III at A00730 (Instruction No. 24); but we are not reversing the wire-fraud convictions because of a faulty instruction. We are reversing because of a lack of sufficient evidence; even if the jury had been correctly instructed, it could not properly have found that the reports were false or fraudulent.

Whether the reports were false depends on what is required to be reported. An SEC regulation mandates that companies follow Form 10-K when filing the annual reports required by § 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m. *See* 17 C.F.R. § 249.310 (2002). A second regulation requires companies wishing to solicit proxies to provide the solicited persons with a publicly filed statement containing the information specified in Schedule 14A. *See id.* § 240.14a-3 (2002). For both Form 10-K and Schedule 14A, information regarding executive compensation must be furnished in accordance with

Regulation S-K, Item 402, *id*. § 229.402 (2002). *See* SEC Form 10-K, Item 11,

*available at* http://www.sec.gov/about/forms/form10-k.pdf (last visited Dec. 1,

2006); 17 C.F.R. § 240.14a-101, Item 8 (2002).

Because of the central importance of the executive-compensation disclosure

requirements to our analysis, we discuss at length Item 402 of Regulation S-K.

Item 402(a)(2) states that the Item

> requires clear, concise and understandable disclosure of all plan and
> non-plan compensation awarded to, earned by, or paid to the
> [covered] executive officers . . . and directors . . . by any person for
> all services rendered in all capacities to the registrant and its
> subsidiaries, unless otherwise specified in this item.

*Id*. § 229.402(a)(1) (2002). Disclosure is made in a Summary Compensation

Table which contains columns in which to report the various components of

compensation. Columns (a) and (b) provide the name and position of the officer

and the fiscal year reported on. *See id*. § 229.402(b)(2)(I), (ii). Annual

compensation is reported in columns (c), (d), and (e) according to the following

directions in Item 402:

> The Table shall include:
>
> . . .
>
>> (iii) Annual compensation (columns (c), (d), and (e)),
>> including:
>>
>>> (A) The dollar value of base salary (cash and non-cash)
>>> earned by the named executive officer during the fiscal year
>>> covered (column (c));

(B) The dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered (column (d)); and

(C) The dollar value of other annual compensation not properly categorized as salary or bonus, as follows (column (e)):

(1) Perquisites and other personal benefits, securities or property, unless the aggregate amount of such compensation is [less than] the lesser of either $50,000 or 10% of the total of annual salary and bonus reported for the named executive officer in columns (c) and (d);

(2) Above-market or preferential earnings on restricted stock, options, SARs [stock appreciation rights] or deferred compensation paid during the fiscal year or payable during that period but deferred at the election of the named executive officer;

(3) Earnings on long-term incentive plan compensation paid during the fiscal year or payable during that period but deferred at the election of the named executive officer;

(4) Amounts reimbursed during the fiscal year for the payment of taxes; and

(5) The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

*Id*. § 229.402(b)(2) (2002).  In addition to annual compensation, the table must disclose (in columns (f), (g), and (h)) any long-term compensation, such as awards of restricted stock and payouts under a long-term incentive plan, *see id*. § 229.402(b)(2)(iv), and (in column (I)) all other compensation, such as change-in-control payments, annual contributions to defined contribution plans, and insurance premiums paid by the company, *see id*. § 229.402(b)(2)(v).

The government's sole challenge to the reports of defendants' compensation is that the reports failed to disclose the defendants' personal use of corporate aircraft.  But the government did not show at trial that disclosure was required.  Use of corporate aircraft is a "perquisite" governed by Regulation S-K Item 402(b)(2)(iii)(C)(1).  *See* John W. White, Dir., Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, Remarks Before the Practising Law Institute Executive Compensation Program:  Principles Matter (Sept. 6, 2006), *in* Practising Law Institute Corporate Law and Practice Course Handbook Series, PLI Order No. 9151 at 396 (Nov. 2006), *also available at* http://www.sec.gov/news/speech/2006/spch090606jww.htm (last visited Nov. 22, 2006) (Director White Remarks); David Yermack, *Flights of Fancy*, Sternbusiness, Fall/Winter 2004, *available at* http://www.stern.nyu.edu/Sternbusiness/fall_winter_2004/flights.html (last visited Nov. 22, 2006) (Yermack, *Flights of Fancy*); *see also* 71 Fed. Reg. 6542-01, 6553

(Feb. 8, 2006) (proposed regulation) (perquisites include "personal travel using vehicles owned or leased by the company"). Disclosure of perquisites is required only if their aggregate value for the year exceeds a threshold equal to the lesser of $50,000 and 10% of the executive's annual salary and bonuses. *See* 17 C.F.R. § 229.402(b)(2)(iii)(C)(1) (2002). For most years at issue, $50,000 was the threshold for each defendant (because their salaries plus bonuses exceeded $500,000 in those years), although Mr. Wittig's threshold was apparently $40,868 in 1999, and Mr. Lake's was apparently $12,341 in 1998 and $26,685 in 1999. There was no evidence that the value of personal travel ever exceeded the reporting threshold. (The government has not pointed to any perquisite other than personal travel as contributing toward the reporting threshold.)

To be sure, the government contended that the value of personal flights far exceeded $50,000 a year for each defendant. It computed the value of a flight by determining what a charter flight for the same trip would cost (including the costs of chartering a plane to fly from the corporate plane's base to the departure point for the trip and from the trip's destination point back to the base). This is not an unreasonable method of measuring the value of the trips to Mr. Wittig and Mr. Lake. But it is not the method required by the SEC. Regulation S-K states: "Perquisites and other personal benefits shall be valued on the basis of the aggregate incremental cost to the registrant and its subsidiaries." *Id*. § 229.402,

Instructions to Item 402 (b)(2)(iii)(C) (2002). The natural interpretation of this language is that the value of a trip is to be computed solely on the basis of the actual additional cost incurred by the corporation in providing the transportation. Thus, for example, if the corporate airplane is flying to New York on business and a member of the Wittig family goes along for pleasure, the value is only the extra cost of adding a passenger. The extra cost may be as little as the cost of additional fuel to fly with the weight of one more passenger plus luggage. Even when the trip is solely for pleasure, the cost to the corporation may be modest. If the pilot is on a salary and is not working overtime, the extra cost might be limited to fuel and maintenance. Although no regulation explains how to determine "aggregate incremental cost," the interpretation above is the interpretation adopted by every treatment of the subject we have found, including a statement by an SEC official. *See* James E. Cooling & Joanne M. Barbera, *Personal Use of the Company Aircraft: IRS vs. FAA vs. SEC*, Cooling & Herbers, P.C., at 3 (2005) *available at* http://www.coolinglaw.com/arts.htm (last visited Dec. 11, 2006); Director White Remarks at 396; Richard L. Handley & Stewart H. Lapayowker, *Compliance Feature: Corporate Aircraft: Four Common Compliance Issues*, ACCA Docket, Nov.-Dec. 2003, at 29. Suffice it to say that the government did not introduce (or even offer) any evidence concerning the cost to Westar of the alleged personal trips benefitting the defendants.

The government suggests that even if the reports to the SEC were not false (because they contained all required information), they were fraudulent. It contends that the reports were misleading because, regardless of SEC requirements, investors and the public would have expected disclosures of personal travel in those reports. It asserts: "Westar had a well-known practice of disclosing ALL compensation (both cash and non-cash) of the top six executives of the company, including defendants. Westar's practice was to include amounts of less than $1,000." Aplee. Br. at 97 (footnotes omitted). To support this assertion, the government at trial pointed to Westar's disclosure of various items of compensation on the Summary Compensation Table in its 14A proxy statement for 1997. The Table disclosed (1) dividend equivalents of less than $10,000; (2) $4,750 paid on behalf of Mr. Wittig under the company's defined contribution plan; (3) premiums of $652 paid for term life insurance; (4) $825,000 paid to Mr. Wittig under the company's relocation plan; (5) a lump-sum payment of $17,000 to Mr. Wittig in lieu of a base-salary increase; and (6) car-allowance payments of $11,997 to various individuals.

The government's argument is essentially that because the company voluntarily disclosed so many other items of compensation, the report lulled people into believing that it would also have reported personal use of corporate aircraft if there had been any. But this argument has merit only if the items

-25-

pointed to on the 1997 statement were not required to be reported. The defendants responded, through testimony of Rick Terrill, former Westar general counsel, that many items must be disclosed regardless of amount. The government failed to show that any reported item was not required to be disclosed. And it appears that an effort to do so would have been vain. Regulation S-K requires a company to report, regardless of amount, all payments of preferential dividend equivalents, *see* 17 C.F.R. § 224.402(b)(2)(iii)(C) Instruction 4; all payments under a defined-contribution plan (hence the reporting of the $4,750 payments), *see id.* § 229.402(b)(2)(v)(D) (2002); and all payments for term life insurance (hence the reporting of the $652 term-life premiums), *see id.* § 229.402(b)(2)(v)(E). It must also disclose "all plan and non-plan compensation," *id.* § 229.402(a)(2). Regulation S-K defines *plan* to include:

> [a]ny plan, contract, authorization or arrangement, whether or not set forth in any formal documents, pursuant to which the following may be received: cash, stock, restricted stock or restricted stock units, phantom stock, stock options, SARs, stock options in tandem with SARs, warrants, convertible securities, performance units and performance shares, and similar instruments. A plan may be applicable to one person. *Registrants may omit information regarding* group life, health, hospitalization, medical reimbursement or *relocation plans that do not discriminate* in scope, terms, or operation, *in favor of executive officers or directors* of the registrant and that are available generally to all salaried employees.

*Id.* § 229.402(a)(7)(ii) (emphasis added). The relocation plan discriminated in favor of executives, so the payment to Mr. Wittig had to be disclosed. And the

payments in lieu of a salary increase and the car allowance were both contractual

payments of cash and therefore had to be disclosed.  The government cannot

contend that Westar reported compensation beyond what was required by law

without establishing what the law required.

In short, the government failed to present evidence from which the jury

could infer beyond a reasonable doubt that any of the reports wired to the SEC

was false, fraudulent, or even misleading.  Under *Parr*, 363 U.S. 370, as we

understand it, the wire-fraud charges were not proved.  And even if we were to

adopt a less-restrictive view of *Parr*, we fail to see how one could infer from the

evidence at trial that a purpose of submitting the reports was in any fashion to

further the alleged fraudulent scheme.  The reports (which, for all we can tell,

were correct) were filed because they had to be.

Because there was insufficient evidence to sustain the wire-fraud charges,

we must reverse the convictions.  Under the Double Jeopardy Clause, the

government is not entitled to another chance to prove its case, so we do not

remand for a new trial on these charges.  *See Burks v. United States*, 437 U.S. 1,

18 (1978); *Anderson v. Mullin*, 327 F.3d 1148, 1155 (10th Cir. 2003).

**B.    Money Laundering**

The money-laundering statute, 18 U.S.C. § 1957, forbids a person from

"knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in

criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." *Id.* § 1957(a). The government must prove five elements: that the defendant "(1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity." *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). "Specified unlawful activity" is any of a number of offenses listed in 18 U.S.C. § 1956(c)(7), *see id.* § 1957(f)(3); it includes wire fraud, *see id.* §§ 1956(c)(7)(A), 1961(1)(B).

The indictment in this case stated that the specified unlawful activity was wire fraud. Accordingly, the laundering counts required proof of wire fraud. But, as we explained in the preceding section, wire fraud was not proved. The government conceded at oral argument that reversal of the wire-fraud counts would require reversal of the money-laundering convictions. We reverse those convictions. As was true of the wire-fraud charges, these charges cannot be retried.

## C. Circumvention of Internal Controls

We also must set aside the circumvention convictions, although the government is not foreclosed from retrying them. In pertinent part the circumvention statute, 15 U.S.C. § 78m(b)(5), states: "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)." Paragraph (2) states:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—
>
> > (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> >
> > (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
> >
> > > (i) transactions are executed in accordance with management's general or specific authorization;
> > >
> > > (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> > >
> > > (iii) access to assets is permitted only in accordance with management's general or specific authorization; and
> > >
> > > (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; . . .

-29-

15 U.S.C. § 78m(b)(2).

All but one of the circumvention counts charged the defendants with circumvention by failing to report personal use of corporate aircraft on annual D&O questionnaires for Westar, Westar Industries, and Protection One (a home-security firm acquired by Westar). There is no question that Wittig and Lake failed to report such personal use on the questionnaires. The issue for trial was whether their failure was with the requisite intent.

Mr. Lake testified that he did not record personal use of company planes on the D&O forms because "I didn't think my personal use was material. . . . [T]he vast majority of my flights involved me traveling all over the place on business. And flights that I thought were purely personal were a small fraction of that." Aplt. App. Vol. XXXIX at 11533. Mr. Wittig did not testify. In support of their position that their failure to disclose was neither knowing nor willful, they presented evidence that on only two occasions between 1995 and 2002 did any officer or director report personal travel on a D&O form, and, in particular, the corporation's general counsel neither reported his own personal flights nor took action when others failed to report. The essence of the government's contrary argument was that the value of the personal flights was so great that their disclosure was obviously material, the defendants wished to conceal their personal flights from shareholders and the public, and any self-proclaimed

-30-

ignorance of disclosure requirements was an intentional ignorance. The government obtained from the court an instruction informing the jury that "knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." *Id*. Vol. III at 00718 (Instruction No. 14).

To assess the defendants' intent in not reporting this travel, the jury needed to know the purpose of the D&O forms. The cover of each form was in the following format:

[Name]

[Year]

ANNUAL QUESTIONNAIRE

[Corporation]

Information Furnished by Each Director,

Nominee for Director, and Officer

*For Use in [Year] Proxy Statement*

*and in Various Reports to the Securities*

*and Exchange Commission and State*

*Regulatory Commissions*

*Id*. Vol. LIV at 15595, 15616, 15636, 15656, 15677, 15699, 15719, 15741, 15760, 15779 (emphasis added). The parties did not address what, if any, information on

these forms was required by state agencies; so the only relevant purpose of the forms was to prepare SEC filings.

As we previously discussed in setting aside the wire-fraud convictions, Regulation S-K required disclosure of an executive's personal use of corporate aircraft only if the additional cost incurred by the corporation exceeded a threshold equal to the lesser of $50,000 or 10% of the executive's salary plus bonuses during the year, and the government offered no substantial proof that this threshold was ever exceeded by either defendant. Thus, there was no evidence that the defendants' failure to disclose information in the D&O forms ever caused a material omission in SEC reports. To be sure, this fact is not dispositive of defendants' intent. They may have thought that there was a risk that their travel would be publicly reported, and fear of such reporting may have caused them to refuse to report their personal travel on the D&O forms. Nevertheless, in assessing the state of mind of each defendant, the jury would likely be influenced by knowing that the omission on the D&O forms apparently did not cause any errors in the reports to the SEC.

The jury, however, was not fairly informed of what the SEC required. The defendants had to rely on a witness, Rick Terrill, Westar's general counsel during the alleged conspiracy. He testified that the SEC measured the value of personal aircraft use on an increased-cost basis and that reporting was required only if the

value exceeded $50,000.  Counsel for each defendant referred to this testimony in final argument.  But Mr. Terrill's bona fides was easily challenged by the government; the prosecutor in closing argument asserted that Mr. Terrill had actively worked to prevent various disclosures, "running interference for Mr. Wittig."  *Id*. Vol. XLVIII at 13923.

And the government, which had devoted substantial time in its case to establishing the charter value of the alleged personal flights, argued to the court and the jury that it was this charter value that mattered.  For example, in closing argument the prosecutor added figures for Mr. Lake's admittedly personal flights and concluded, "For a total of $208,000 in chartered valued flights.  Material."  *Id*. Vol. XLVIII at 13946.  Particularly ironic is the government's obtaining from the district court an instruction that informed the jury that a defendant could be charged with knowledge of something that he deliberately blinded himself to.  One purpose of the instruction was to allow the jury to find that the defendants knew what was required to be reported on their D&O forms.  Yet, at least as far as the trial evidence showed, there was no necessity to report their travel on corporate aircraft because it would not need to be reported to the SEC in any event.  What the defendants allegedly blinded themselves to may well have been that there was no good reason to report their personal travel.

To respond to the government's arguments, the defendants requested the district court to instruct the jury on what disclosure was required by the SEC. The court denied the request. In the context of this case, we hold that this refusal was reversible error. When a defendant's defense is so dependent on an understanding of an applicable law, the court has a duty to instruct the jury on that law, rather than requiring the jury to decide whether to believe a witness on the subject or one of the attorneys presenting closing argument. Indeed, it is ordinarily improper to have a witness testify regarding what the applicable law is; it is the trial judge's duty to inform the jury on the matter. *See Specht v. Jensen*, 853 F.2d 805, 807-08 (10th Cir. 1988) (en banc); *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986). It was error for the district court to abdicate its responsibility in this regard and let opposing counsel argue their competing theories, especially when the defendants' view of the law was the correct one. Accordingly, the convictions for failure to complete properly the D&O forms must be set aside.

We further hold that the remaining circumvention conviction must also be reversed. That conviction rested on Mr. Wittig's directive to an auditor not to audit the corporation's flight logs and his refusal to provide the logs to her. We of course are in no position to assess Mr. Wittig's intent, and we readily acknowledge that he may have intended to circumvent Westar's internal controls

by forbidding the audit. But we doubt that the jury could fairly appraise Mr. Wittig's *mens rea* without being properly informed of the governing law. We have concluded that the district court's failure to instruct the jury on the SEC's regulations constituted error. The government bears the burden of showing that this error was harmless with regard to the remaining circumvention count. Yet it has not even argued harmless error to this court.

### D. Conspiracy

#### 1. Need for New Trial

The defendants were also convicted of a conspiracy to commit wire fraud, money laundering, and circumvention. The verdict forms show that the jury found all three objects of the conspiracy. One can be guilty of a conspiracy to commit an offense without committing the substantive offense itself. *See United States v. Horn*, 946 F.2d 738, 745 (10th Cir. 1991). For example, the defendants may have conspired to commit wire fraud without succeeding in committing wire fraud itself because the filings with the SEC fortuitously turned out to be accurate. Nevertheless, our reasons for reversing the substantive convictions convince us that we also must reverse the conspiracy convictions of both Mr. Wittig and Mr. Lake. The jury could not accurately evaluate the conspiracy allegations without being informed regarding what was required to be in the SEC filings. Those requirements are a critical consideration not only with respect to

conspiracy to commit wire fraud (because no crime would be committed unless the SEC filings were false or fraudulent), but also conspiracy to commit money laundering (which requires wire fraud as a predicate offense) and conspiracy to circumvent (because the conspirators must have agreed to commit an offense that requires knowing and willful circumvention of internal controls instituted to satisfy SEC requirements). Accordingly, we set aside the conspiracy convictions.

### 2. Conspiracy to Circumvent

The defendants have not argued that there was insufficient evidence to support the conspiracy verdict, so we need not consider whether a new trial is barred by the Double Jeopardy Clause. They do, however, contend that portions of the conspiracy charges are legally unsound. If that contention were correct, we would need not only to set aside the convictions on those charges but also to prohibit retrial. We therefore address that contention.

The defendants assert that (1) conspiracy to circumvent is not a crime and (2) a conviction for circumvention cannot be predicated on coconspirator liability. (Each was convicted on some counts of circumvention based on the other's failure to report personal travel on a D&O form.) They rely on the language of 15 U.S.C. § 78m(b), whose pertinent provisions are:

> (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—

-36-

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

(i) transactions are executed in accordance with management's general or specific authorization;

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(iii) access to assets is permitted only in accordance with management's general or specific authorization; and

(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and

(C) notwithstanding any other provision of law, pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 7219 of this title.

. . . .

(4) No criminal liability shall be imposed for failing to comply with the requirements of paragraph (2) of this subsection except as provided in paragraph (5) of this subsection.

(5) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

They argue that conspiracy to circumvent is not a crime because paragraph (4) limits criminal liability to that specified in paragraph (5), and paragraph (5) does not include liability for coconspirators.

We disagree. The criminal-penalty provision for the Securities Exchange Act of 1934 is 15 U.S.C. § 78ff, which states:

> (a) Willful violations; false and misleading statements
>
> Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report or document required to be filed under this chapter or any rule or regulation thereunder . . . which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both . . . but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

Under 18 U.S.C. § 371, "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." Moreover, a "conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy." *United States v. Brewer*, 983

F.2d 181, 185 (10th Cir. 1993) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946) and *United States v. Kissel*, 218 U.S. 601, 608 (1910)).

Criminal liability for coconspirators is entrenched in federal law. The defendants, however, would have us carve out an exception to this traditional rule for circumvention violations. To be sure, on rare occasions it is apparent that a coconspirator should not be criminally liable because of the statutory description of the substantive offense. For example, in *Gebardi v. United States*, 287 U.S. 112 (1932), the Supreme Court considered whether a woman who consented to be transported across state lines for immoral purposes in violation of the Mann Act could be found guilty of conspiring to violate the Act, which imposed a criminal penalty on one who transported a woman in interstate commerce for immoral purposes. *See id.* at 118-23. In holding that she could not, the Court determined that "the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent" showed an "affirmative legislative policy to leave her acquiescence unpunished." *Id.* at 123. Similarly, in *United States v. Castle*, 925 F.2d 831 (5th Cir. 1991) (per curiam), the court found that foreign officials could not be charged with conspiracy to pay bribes under the Foreign Corrupt Practices Act because Congress had "excluded from prosecution for the substantive offense" such officials, who are "the very individuals whose participation was required in every case." *Id.* at 835. The

defendants in *Gebardi* and *Castle* had clearly conspired to commit a substantive offense; the woman in *Gebardi* had agreed to be transported between states for immoral purposes, and the foreign official in *Castle* had agreed to be paid a bribe. But in both cases the role of the defendant coconspirator was so central to the commission of the substantive offense that the failure of the statute defining the substantive offense to prohibit that role explicitly was a compelling indication of legislative intent not to punish such a coconspirator. The defendants here, however, have not argued, and could not argue, that their alleged roles in criminal violations of 15 U.S.C. § 78m(b)(2) are of that nature. The involvement of one defendant as a coconspirator was hardly essential for the other defendant to commit the substantive circumvention offense.

Instead, the defendants rely on the language of paragraphs (4) and (5) of § 78m(b), which states that criminal liability for violations of paragraph (2) can be imposed only if a person "knowingly circumvent[s] or knowingly fail[s] to implement a system of internal accounting controls or knowingly falsif[ies] any book, record, or account described in paragraph (2)." Paragraph (5) certainly limits criminal liability in two respects. First, only certain types of violations of paragraph (2) can be the basis of criminal prosecution—namely, circumvention of or failure to implement a system of internal accounting and falsifying a book, record, or account. Second, paragraph (5) imposes an additional scienter

-40-

requirement for criminal liability.  In addition to the willfulness required by § 78ff, the violation must be knowing.  We recognize that § 78ff provides that a defendant cannot be imprisoned if "he proves that he had no knowledge of [the violated] rule or regulation."  But this provision does not perform the same work as the "knowingly" requirement of paragraph (5):  Paragraph (5), unlike the lack-of-knowledge provision in § 78ff, applies to lack of knowledge of a statutory provision; paragraph (5) shifts the burden of persuasion regarding knowledge from the defendant to the government; paragraph (5) makes lack of knowledge a complete defense, not just a barrier to imprisonment; and the "knowingly" requirement of paragraph (5) may not be congruent with a requirement of "knowledge of the rule."  Although it may be unclear what a "knowing" requirement adds to the willfulness required by § 78ff, there is little doubt that Congress has thought it adds something.  *See United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) (Friendly, J.) (commenting on use of "willfully" in one provision of § 78ff and use of "willfully and knowingly" in another).

What the defendants contend is that § 78m(b)(4) and (5) also impose a third limit on criminal liability—namely, limiting liability to only the actual perpetrator of the deed, excusing any coconspirator (or aider or abettor, for that matter). They read the statutory language as implicitly overriding 18 U.S.C. § 371 and the hoary doctrine that holds coconspirators liable for commission of a reasonably

-41-

foreseeable substantive offense.  We disagree.  Traditionally there is no need for the statute setting forth the substantive offense to make any reference to liability for conspiracy.  That job is performed by 18 U.S.C. § 371.  To say, as § 78m(b)(4) does, that criminal liability shall be imposed only in certain circumstances would ordinarily be understood as only a restriction on the scope of the substantive offense, not as an implied repeal of traditional liability for partners in crime.  Perhaps one could be tempted to construe § 78m(b)(4) as having the purpose of limiting such liability if there were no other apparent purpose for the provision.  But there *is* such an apparent purpose—limiting the criminal liability of all persons (principals as well as aiders, abettors, and coconspirators) who violate a highly technical statutory requirement by adding a scienter requirement and confining criminal liability to only a subset of statutory violations.

Supporting our view is the absence of any apparent reason why Congress would want to single out § 78m(b)(2) by excluding coconspirator liability.  The limitations on criminal liability in § 78m(b)(4) and (5) protect the coconspirator as well as the principal.  The coconspirator must act willfully and knowingly and is criminally liable only for a subset of violations of paragraph (2).  It escapes us why a coconspirator would then need greater protection than would the principal perpetrator.

-42-

In sum, the liability of coconspirators is a well-entrenched feature of federal criminal law. If Congress wishes to limit it in certain circumstances, we would expect it to be explicit about what it is doing. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 88 (1982) ("repeals by implication are disfavored" (internal quotation marks omitted)); *United States v. Hahn*, 359 F.3d 1315, 1321-22 (10th Cir. 2004) (en banc) (same). Moreover, we see no reason why Congress would wish to eliminate the liability of coconspirators with respect to violations of § 78m(b)(2). Accordingly, we reject the defendants' contention that they can be convicted only as principals. *Cf. United States v. O'Hara*, 960 F.2d 11, 13 (2d Cir. 1992) (upholding guilty plea to aiding and abetting violation of § 78m(b)(2), but no argument made concerning effect of § 78m(b)(4), (5).)

### D.    Recusal of Judge on Retrial

Finally, the defendants contend that the trial judge displayed such bias in the first two trials that she should not be permitted to preside at any trial on remand. We are not persuaded. Certainly the defendants disagreed with a number of her rulings, and we have held that several of the defendants' contentions were correct. But those rulings did not display a disqualifying bias. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("judicial rulings alone almost never constitute a valid basis for a bias or partiality motion").

### III.   CONCLUSION

We REVERSE the defendants' convictions for wire fraud and money laundering, and these counts cannot be retried.  We also REVERSE their convictions for conspiracy and circumvention, though without prejudice to retrial. The forfeiture count is also REVERSED and REMANDED for retrial.