**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | No. 07-6255 |
| v. | (W.D. Oklahoma) |
| JOSEPH CONRAD THERRIEN, | (D.C. No. 5:06-CR-00264-HE-3) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

Joseph Conrad Therrien was convicted on one count of wire fraud, *see* 18 U.S.C. § 1343, and one count of money laundering, *see id.* § 1957, arising from his submitting false information to qualify for a mortgage to obtain a home. He appeals both convictions. His sole argument is that there was insufficient evidence to prove that he provided false information with fraudulent intent. Not persuaded, we affirm the convictions.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    BACKGROUND

Mr. Therrien was one of seven defendants indicted in the United States District Court for the Western District of Oklahoma on 14 counts for similar fraudulent conduct in procuring home mortgages. Three counts named Mr. Therrien, but he was acquitted on one. The counts on which he was convicted related to his acquisition of a mortgage from Argent Mortgage in October 2003 to acquire a home at 1000 Irvine Drive in Edmond, Oklahoma. Mr. Therrien's real-estate agent in the transaction was Brandon L. Baum, a codefendant. Baum told him that he could obtain a mortgage loan that would enable him to purchase a home in an upscale neighborhood and also provide money that he could use for Rane, a nightclub that Mr. Therrien owned with Dalton Alford and a man in California.

The Irvine Drive property was listed by the owners at $335,000. But Mr. Therrien, through Baum, arranged to state the sale price at $405,000 for purposes of closing. The sellers' understanding was that Mr. Therrien wished to do some remodeling and wanted one loan to cover the purchase and the remodel. An addendum to the real-estate purchase contract provided that the sellers would give Alliance Construction (which, unknown to the seller, was simply a name on a bank account, not an operating business) $60,000 for remodeling after the sale closed. An appraiser was found who set the home's (unremodeled) value at $408,000.

The increase in the price of the home from $335,000 to $405,000 enabled Mr. Therrien to borrow more money from Argent, as Argent would lend 95% of the cost of a home. (The record is unclear why the sale price was increased by $70,000 rather than just the $60,000 for the purported remodel, but we note that the seller agreed to pay $10,000 in closing costs.) The remaining 5%, however, was required to come from the borrower's own funds. Mr. Therrien apparently used his own money to make a $2,000 earnest-money deposit at the time that he entered into the purchase contract, but he borrowed $20,250 from Baum and Baum's associates to make the payment required by Argent to come from him at closing. When the home sale closed, $60,000 was disbursed to an account in the name of Alliance Construction. Funds from that account then repaid those who had loaned the down-payment money to Mr. Therrien and also purchased a $38,750 cashier's check to Alford for the nightclub Rane. In short, the increase in the purported sale price of the home enabled Mr. Therrien to acquire an upscale home while paying only a fraction of the down payment with his own money and obtaining an infusion of $38,750 for his business.

To effect this useful transaction, it was necessary to deceive Argent about the nature of the transaction and the credit-worthiness of Mr. Therrien. Thus, (1) Argent was not informed of the addendum to the purchase contract regarding the $60,000 payment to Alliance, (2) it was told that Mr. Therrien did not borrow any

of the down payment, and (3) it was provided false information regarding Mr. Therrien's income and bank-account balance.

## II.   DISCUSSION

We review the evidence de novo to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *See United States v. Gallant*, 537 F.3d 1202, 1222 (10th Cir. 2008). "To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) . . . use of interstate wire . . . communications to execute the scheme." *Id.* at 1228 (internal quotation marks omitted). The wire communication establishing the third element of the charge was the wire transfer of loan money by Argent to the title company handling the closing. Although Mr. Therrien's brief to this court suggests that the wire communication itself must be false or fraudulent, that is not correct. It is enough that the communication's purpose was to execute the scheme. *See United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008). *But cf. United States v. Lake*, 472 F.3d 1247, 1255–56 (10th Cir. 2007) (if wire communication was necessary to satisfy regulatory requirement and did not contain false information, its purpose was not to further the fraudulent scheme).

To sustain a conviction for money laundering under 18 U.S.C. § 1957, "[t]he government must prove five elements: that the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) that the property is, in fact, derived from specified unlawful activity." *Lake*, 472 F.3d at 1260 (internal quotation marks omitted). *Specified unlawful activity* is defined to include wire fraud. *See id.* ("'Specified unlawful activity' is any of a number of offenses listed in 18 U.S.C. § 1956(c)(7), . . . includ[ing] wire fraud." (citation omitted)). And *criminally derived property* is property (such as money) acquired through a criminal offense, such as wire fraud. *See id.* The alleged monetary transaction in this case was the $38,750 check issued from the account of the make-believe construction company, Alliance Construction, to Alford for use by Rane, the nightclub in which he and Mr. Therrien were partners. Mr. Therrien's sole challenge to the money-laundering conviction is that the government did not prove wire fraud, so that there was no specified unlawful activity or criminally derived property. His challenge therefore depends on the merits of his challenge to the wire-fraud conviction and need not be discussed separately.

The government relies on several deceptive acts to support its charge that Mr. Therrien participated in a fraudulent scheme: (1) the statement on his loan application sent to Argent that his base monthly employment income was

$10,250; (2) his handwritten letter to Argent stating that he earned $4,500 a week; (3) the statement on his loan application that no part of the down payment was borrowed; (4) the failure to disclose to Argent the addendum to the purchase agreement regarding the payment to Alliance ostensibly for remodeling; and (5) the alteration of his bank's verification-of-deposit form to show an account balance and average balance of $24,117 and $22,653, respectively, not the actual amounts of $0 (because the account had been closed) and $2,653.

The only allegedly false statement that Mr. Therrien claims to be true is his statement of income on his loan application. He argues that the government failed to prove that he did not have a "Gross Monthly Income" of $10,250. Aplt. Br. at 6. He points out that his business partner Alford testified that Rane, their nightclub, was "generating a lot of money," R. Vol. VII at 1275, and "was making a lot of money, but it had been mismanaged," *id.* at 1278. He also relies on evidence that the nightclub had a bank balance of $17,970 at the end of one month and went up to $19,478 during the next month.

We are not persuaded. To begin with, the $10,250 figure was not for gross monthly income. The entry of $10,250 was in a box labeled "Base Empl. Income," which was one of seven boxes under the general heading of "Gross Monthly Income." Also, Mr. Therrien neglects to mention that the month in which the nightclub bank balance rose to $19,478 ended with a balance of a mere $491.79. In any event, the jury could have readily found that Mr. Therrien's

monthly income was well under $10,250. His partner Alford testified that both he and Therrien had an income from Rane of $500 a week at the time of the loan; and his federal income-tax return for 2003 reported a $1,669 loss for his interest in Rane.

As for the other deceit, Mr. Therrien contends that the government did not prove that he even knew of the misrepresentations and failures to disclose. He relies on Alford's testimony as indicating that Mr. Therrien simply signed blank forms provided to him and that some of the documents that he signed might have been altered. But it is one thing to sign a long legal document without reading its opaque provisions. It is quite another to sign without reading an application form with only a modest number of entries that convey representations about the signer personally. Common sense tells us that an honest person would review those entries. One could reasonably infer that if Mr. Therrien did not check the completed application form for accuracy, it was because he knew that it would have to contain false information for him to obtain such a large loan when he had so little income and capital. His very "indifference to the truth of statements" on the form would support a finding of fraudulent intent. *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (internal quotation marks omitted).

More broadly, Mr. Therrien argues that "[a]t most, the evidence at trial indicates that Mr. Therrien wanted a mortgage with some cash back at closing that he could pour back into his troubled nightclub." Aplt. Br. at 11. What an

interesting defense!  No doubt every participant in a fraudulent scheme just wants a part of the American Dream—say, an upscale home and a business that can acquire capital whenever it is needed.  The question, though, is whether Mr. Therrien intended to deceive Argent to obtain the loan.  The subprime-loan crisis suggests that perhaps some fully informed lender might have given him what he wanted anyway.  But the jury was entitled to infer that he thought that he could obtain the loan only through fraud and that he knowingly participated in the effort.  *See United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) ("Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use."  (quoting Kathleen Flavin & Kathleen Corrigan, *Eleventh Survey of White Collar Crime:  Mail Fraud and Wire Fraud*, 33 Am. Crim. L. Rev. 861, 869–70 (1996))).

## II.    CONCLUSION

We reject Mr. Therrien's sufficiency-of-the-evidence challenges and AFFIRM his convictions for wire fraud and money laundering.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge