**UNITED STATES of America,**
**Plaintiff,**

v.

**Bartice A. KING, et al., Defendants.**

**Case No. CR–13–063–F**

United States District Court,
W.D. Oklahoma.

Signed 07/03/2014

Travis D. Smith, John S. Han, Robert Don Evans, Jr., Scott E. Williams, Travis D. Smith, Wilson D. McGarry, US Attorney's Office–OKC, Oklahoma City, OK, for Plaintiff.

Nathan J. Mays, Dan B. Gerson, The Law Offices of Nathan J Mays PC, Houston, TX, James D. Henderson, Law Offices of James D Henderson, Santa Monica, CA, Robert M. Goldstein, Law Office of Robert Goldstein Boston, MA, Craig D. Corgan, Craig Corgan Attorney at Law Yukon, OK, J. Patrick Quillian, J Patrick Quillian PC, Paul A. Lacy, Federal Public Defender–OKC, David B. Autry, Perry W. Hudson, Perry W. Hudson, Robert S. Jackson, Oklahoma City, OK, Jerry W. Biesel, Dallas, TX, Steve T. Jumes, Varghese Summersett & Smith, Fort Worth, TX, for Defendants.

## ORDER

STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

The defendants named in the substantive money laundering counts in the Superseding Indictment in this case have moved to dismiss those counts, asserting that venue for those counts is not properly laid in this district. The question presented is whether an 18 U.S.C. § 1957 money

laundering charge may be tried in this district when the government does not assert, and the record does not show: (i) that any of the specific transactions listed in the substantive money laundering counts had anything to do with the Western District of Oklahoma, or with any financial institution in this district, or (ii) that any of the transactions comprising the laundering offenses charged were begun, continued or completed in this district, or (iii) that any funds identifiably connected with the charged transactions were—by any person, money laundering defendant or not—transferred out of or through the Western District of Oklahoma to the recipients listed in the substantive money laundering counts.

■ The answer is no. The government's "commingling" theory of venue for the substantive money laundering courts is without merit. The government's related theory that, for venue purposes, substantive money laundering under § 1957 should, in essence, be treated as an adjunct of the underlying unlawful activity is equally without merit. Venue for the substantive money laundering counts is not properly laid in this district, and those counts must consequently be dismissed.

## I.

### Procedural Background

In Counts 4–16 of the sixteen-count Superseding Indictment, six of the fifty-six defendants in this case are charged with money laundering in violation of 18 U.S.C.

§ 1957, and as aiders and abetters of those offenses under 18 U.S.C. § 2. Five of those defendants, Bartice A. King, Serena Monique King, Starting 5, LLC, Spiros G. Athanas and William J. Bates, have moved [1] to dismiss the money laundering counts, asserting that venue for those counts is not properly laid in the Western District of Oklahoma.[2] The moving defendants originally filed motions [3] to dismiss the money laundering counts, attacking venue based on the face of the Superseding Indictment. Those motions were denied because the Superseding Indictment did not, on its face, shed light one way or the other on the question of whether venue was properly laid in this district.[4] See, doc. no. 649, at 4 (minutes of January 9, 2014 motion hearing). Because of the seriousness of the consequences which would flow from an erroneous determination of the venue issue, and because the right to be tried only in a legally authorized venue is obviously (to borrow the words of the Supreme Court from a different context) "a right not to be tried which must be upheld prior to trial if it is to be enjoyed at all," United States v. MacDonald, 435 U.S. 850, 861, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978) (internal quotation marks omitted), the court determined that the venue issue should be decided by way of a second set of motions to dismiss, to be filed after requiring the government to file a bill of particulars stating with specificity the facts upon which the government relies to support venue in this district as to the substantive money laundering counts.

1. Bartice A. King at doc. no. 703, Serena Monique King at doc. no. 701, Starting 5, LLC at doc. no. 704, Spiros G. Athanas at doc. no. 700 and William J. Bates at doc. no. 699.

2. The sixth defendant, Olmos Overseas, Ltd., has not appeared.

3. Bartice A. King at doc. no. 489, Serena Monique King at doc. no. 567, Starting 5,

LLC at doc. no. 571, Spiros G. Athanas at doc. no. 514 and William J. Bates at doc. no. 636.

4. An indictment is not legally insufficient for failure to allege venue. United States v. Honneus, 508 F.2d 566, 570 (1st Cir. 1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); United States v. Branan, 457 F.2d 1062, 1065 (6th Cir. 1972).

The second set of venue motions has now been filed and fully briefed. In addition, the court has the benefit of the arguments presented in the January 9 hearing with respect to the first set of venue motions. The motions are ripe for determination.

## II.

### The Superseding Indictment

The Superseding Indictment, doc. no. 354, was filed on August 21, 2013.[5] All of the individual defendants are charged in Count 1 with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), in Count 2 with operating an illegal gambling business in violation of 18 U.S.C. § 1955 (and aiding and abetting under 18 U.S.C. § 2), and in Count 3 with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). There are twenty-two corporate defendants charged in Counts 1 and 3, but not in Count 2. Counts 4—16, the counts addressed in this order, charge substantive money laundering under 18 U.S.C. § 1957, and aiding and abetting under 18 U.S.C. § 2. Venue is not challenged with respect to Count 3—money laundering conspiracy.

The government asserts that the RICO enterprise and illegal gambling operation "operated in over 40 states, including the Western District of Oklahoma." Doc. no. 694, at 2. Taking the government's allegations as true, it is fair to say that the defendant Bartice A. "Luke" King was unquestionably the boss of the gambling enterprise and that the enterprise generated very large amounts of money by taking bets, primarily on sporting events, by telephone and over the internet. The operation—commonly known as Legendz Sports—was initially based in Costa Rica, but the headquarters moved to Panama in 2003. Mr. King had a substantial staff in Panama and an extensive network of runners, bookies, agents and subagents in the United States. As alleged in the Superseding Indictment:

63. Legendz Sports operated a number of Internet websites, hosted on servers primarily located outside the United States, which did business in the United States by, among other things, offering, facilitating and conducting unlawful computer and telephone service-based sports betting, and other forms of gambling. Legendz Sports caused the operation of toll-free telephone services to facilitate sports gambling and to take sports bets.

64. Legendz Sports also used bookmakers ("bookies") located in the United States to illegally solicit and accept sports wagers from individuals residing in the United States. Legendz Sports further used bookmakers ("bookies") to settle gambling debts with individuals residing in the United States.

Superseding Indictment, doc. no. 354, at 15—16.

As for the substantive money laundering counts, various combinations of defendants (not more than four in any one count) are charged in Counts 4—16. Because those counts are the subject of this order, they are shown here their entirety.[6] The Superseding Indictment states:

### COUNTS 4 TO 16

#### (Money Laundering—Monetary Transactions)

108. The Grand Jury realleges and incorporates by reference Paragraphs 1–86 and 90–105 of this Superseding In-

---

**5.** The original indictment was filed on March 20, 2013. It was filed under seal and remained under seal until April 10, 2013. The Superseding Indictment was filed under seal and remained under seal until September 17, 2013.

**6.** Material that appears in tabular format in the Superseding Indictment is not indented.

dictment as though fully set forth herein.

109. On or about the dates set forth below, within the United States, using funds, in part, representing the proceeds of racketeering activity in the Western District of Oklahoma, defendants **LUKE KING, SERENA KING, SPIROS G. "THE GREEK" ATHANAS, WILLIAM JAMES "BILL" "BILLY" "WILD BILL" BATES, STARTING 5, LLC,** and **OLMOS OVERSEAS, LTD.,** did knowingly engage and attempt to engage in the following monetary transactions, by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is, the transfer of funds, such property having been derived from a specified unlawful activity, that is, a racketeering conspiracy and operating an illegal gambling business, in violation of Title 18, United States Code, Sections 1962(d) and 1955:

**Property Taxes for Home**

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|-------|-----------|------|--------|-------|-----------------|
| 4 | LUKE KING | 11/8/10 | $42,142.26 | J.R. Moore, Jr. Property Taxes (2 Palmer Crest) | Banco General CC #372280411 |

**Purchases of Rental Properties**

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|---|---|---|---|---|---|
| 5 | LUKE KING | 11/25/08 | $16,300.70 | Harold D. & Faye L. Thompson (82 Blue Creek Road) | Bartice A. King and Serena M. King, debit from Wachovia Bank Acct. ending in 6532 |
| 6 | LUKE KING, SERENA KING, and STARTING 5, LLC | 4/28/10 | $158,705.01 | Charter Title Co. (22 Nestlewood Place) | Bartice A. King and Serena M. King, Wachovia Bank Acct. ending in 6532, CC # 1700821543 |
| 7 | LUKE KING, SERENA KING, and STARTING 5, LLC | 7/9/10 | $157,500.00 | Charter Title Co. (30 Nestlewood Place) | Banvivienda Bank Panama Ck# 1366 |
| 8 | LUKE KING, SERENA KING, and STARTING 5, LLC | 9/1/11 | $25,000.00 | Courtney Williams (206 N. Vesper Bank Circle) | Starting 5 LLC and Serena M. King Amegy Bank of Texas Acct. ending in 5494, CC #471487 |
| 9 | LUKE KING, SERENA KING, STARTING 5, LLC, and OLMOS OVERSEAS, LTD. | 12/9/11 | $102,485.00 | Wire Transfer to First American Title Co. (206 N. Vesper Bank Circle) | Olmos Overseas, Ltd., Banco Panameno De La Vivienda, S.A., Acct. ending in 6842 |

**Purchase of Motorcycle**

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|-------|-----------|------|--------|-------|-----------------|
| 10 | LUKE KING and WILLIAM JAMES "BILL" "BILLY" "WILD BILL" BATES | 1/6/09 | $14,385.59 | Bruce Rossmeyer Harley-Davidson | Global Bank Corporation, Wachovia Bank, NA, Acct. ending in 4138 , Ck. # 13710 |

## Retirement Fund

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|-------|-----------|------|--------|-------|-----------------|
| 11 | LUKE KING | 4/15/08 | $45,000.00 | Invesco AIM | Bartice A. King and Serena M. King, Wachovia Bank, N.A., Acct. ending in 6532, Ck # 1029 |
| 12 | LUKE KING | 3/13/09 | $46,000.00 | Invesco AIM | Global Bank Corporation, Wachovia Bank, N.A., Acct. ending in 4138, Ck # 014284 |

## Property Remodeling

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|---|---|---|---|---|---|
| 13 | SPIROS G. "THE GREEK" ATHANAS | 4/7/08 | $46,000.00 | Designworks Homebuilders, LLC | Spiros Athanas Laconia Savings Bank, Acct. ending in 7707, Ck #121 |
| 14 | SPIROS G. "THE GREEK" ATHANAS | 5/14/08 | $122,556.91 | Designworks Homebuilders, LLC | Spiros Athanas Laconia Savings Bank, Acct. ending in 7707, Ck #130 |
| 15 | SPIROS G. "THE GREEK" ATHANAS | 8/26/08 | $140,658.09 | Designworks Homebuilders, LLC | Spiros Athanas Laconia Savings Bank, Acct. ending in 7707, Ck #139 |

### Purchase of Hangar

| COUNT | DEFENDANT | DATE | AMOUNT | PAYEE | SOURCE OF FUNDS |
|---|---|---|---|---|---|
| 16 | SPIROS G. "THE GREEK" ATHANAS | 10/7/09 | $180,000.00 | Morris Gordon | Spiros Athanas Laconia Savings Bank, Acct. ending in 7707, Ck #176 |

All in violation of Title 18, United States Code, Section 1957; and Title 18, United States Code, Section 2.

Doc. no. 354, at 59—64.

### III.

### The Venue Statutes

The government asserts that venue for the substantive money laundering counts is properly laid in the Western District of Oklahoma under 18 U.S.C. § 1956(i) and 18 U.S.C. § 3237(a).

Section 1956(i) states as follows:

(i) Venue. (1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in–

(A) any district in which the financial or monetary transaction is conducted; or

(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

The government disclaims reliance on subsection (i)(1)(A). Doc. no. 693, at 2. The government thus argues, under § 1956, that the substantive money laundering counts are "continuing offenses whose venue is proscribed [sic] by 18 U.S.C. §§ 1956(i)(1)(b) [sic] and 1956(i)(3)." *Id.* at 4.

Section 3237(a) provides that:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

## IV.

## The Bill of Particulars and the Government's Factual Contentions as to Venue

### A. Introduction.

As has been noted, in the first wave of defense motions filed under the scheduling order, the defendants named in Counts 4—16 moved to dismiss on venue grounds.[7] Although the motions were denied because the facts relevant to venue were not ascertainable from the face of the Superseding Indictment, it became apparent at the motion hearing that the government relied predominantly, if not entirely, on a commingling theory to establish venue in this district for the substantive money laundering counts. Some explanation is necessary.

The substantive money laundering provision relevant to these motions is 18 U.S.C. § 1957. Superseding Indictment, p. 64. Section 1957 criminalizes "monetary transaction[s]" that meet the statute's requirements. 18 U.S.C. § 1957(a). As relevant here, a "monetary transaction" is "the *deposit, withdrawal, transfer, or exchange,* in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) *by, through, or to a financial institu-*

---

**7.** Under the scheduling order, motions in that first wave were limited to matters appearing

on the face of the Superseding Indictment.

*tion* (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ." 18 U.S.C. § 1957(f)(1) (emphasis added). The focus, quite clearly, is on identifiable transactions. In turn, the § 1956 venue provision, which governs venue for prosecutions under § 1957, permits venue to be laid in any district where the underlying specified unlawful activity could be prosecuted *"if the defendant participated in the transfer of the proceeds* of the specified unlawful activity *from that district* to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(B) (emphasis added). Again, the focus is on identifiable transactions, and the district in which the charge is brought must be the district that supplied "the proceeds" for the laundering transaction that occurred in some other district.[8]

At the January 9, 2014 motion hearing, the plain language of § 1956(i)(1)(B) prompted the court to inquire of the government as follows:

> [By the court:] Does the government intend to show that the funds involved in the transactions set forth in those counts—bearing in mind that money laundering focuses on transactions, discrete transactions, does the government intend to show that the funds involved in those counts, 4 through 16, were, in fact, transferred to the recipients from the Western District of Oklahoma?

Jan. 9, 2014 transcript, doc. no. 688, at 91.

After some discussion, the government summarized its position as follows:

> MS. COX: Well, in the sense that the money is commingled and that originally the source of the money came from the United States, including the Western District of Oklahoma, to the outside the

United States organization and then was funneled back into either the Southern District of Texas or the District of New Hampshire, it's impossible to trace the specific cash money, but *we would argue that the money did involve the transfers of money, at least in part, from proceeds within the district, the Western District of Oklahoma, to Panama and back.*

*Id.* at 94 (emphasis added).

The government elaborated as follows:

> MS. COX: Well, I think the government's position, Your Honor, is that by virtue of the fact that the underlying specified unlawful activity that's charged is the RICO charge itself, the conspiracy to commit RICO, which occurred in this district and elsewhere and that *necessarily there are funds coming from the Western District of Oklahoma into Panama and then those funds are being brought back into the United States, there is participation in the transaction from the Western District of Oklahoma.*
>
> THE COURT: Well, okay. Taking Count 4, $42,142.26, the payee is J.R. Moore, the source of funds is Banco General, CC, does the government intend to show that that $42,142.26 came from the Western District of Oklahoma?
>
> MS. COX: Our argument would be that it would come, in part, by virtue of it being proceeds from activity that occurred in the Western District of Oklahoma.

*Id.* at 95–96 (emphasis added).

**B. The Bill of Particulars.**

It thus became apparent at the January 9 hearing that a bill of particulars should be required, for the purpose of enabling the court to determine how the facts relevant to venue for Counts 4–16 square with

---

**8.** The effect of § 1956(i)(3) and 18 U.S.C. § 3237(a), also relied upon by the government, is discussed in Parts V (C) and (D), below.

the requirements of § 1956(i)(1)(B). Because the government cites provisions other than § 1956(i)(1)(B), that provision is not the end point of the court's analysis, but it surely must be the beginning point.

On January 14, 2014, the court entered an order requiring bills of particulars as to several aspects of the case. Doc. no. 672. The order for Bill of Particulars No. 1 directed the government to file a bill of particulars as to the substantive money laundering counts. The operative part of the order for Bill of Particulars No. 1 stated as follows:

Bill of Particulars No. 1 shall, *separately as to each count of Counts 4–16*, be divided into five subdivisions, as follows (taking Count 4 by way of example only):

Subdivision 1: State how and when the $42,142.26 was transferred from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted. If the government does not contend that the $42,142.26, was transferred from the Western District of Oklahoma as an identifiable sum, in one or more identifiable transactions totaling $42,142.26, the government shall so state.

Subdivision 2: State how and when the defendant Luke King participated in the transfer of the $42,142.26 from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted. If the government does not contend that King directly participated in one or more identifiable transactions totaling $42,142.26 by which

that sum was transferred from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted, the government shall so state.

Subdivision 3: State how (if the government so asserts) and when King participated as an aider and abetter in one or more identifiable transactions totaling $42,142.26 by which that sum was transferred from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted. If the government does not contend that King participated as an aider and abetter in one or more identifiable transactions by which the $42,142.26 was transferred from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted, the government shall so state. (Facts responsive to this paragraph are facts indicating participation as an aider and abetter in *specific transactions* relating to the laundering alleged in Count 4—*not* general aiding and abetting of criminal activity alleged to have occurred partly in this district.)

Subdivision 4: If the government asserts (*in lieu of* direct participation or participation as an aider and abetter, or *in addition to* direct participation or participation as

an aider and abetter), that venue may be established in the Western District of Oklahoma as to Count 4 on the basis of King's *general* involvement in criminal activity, including criminal activity by defendants in this district (generating proceeds of unlawful activity which formed some portion of the $42,142.26 in laundered funds, or of which the $42,142.26 in laundered funds were a part), the government shall (i) so state, and (ii) state, at least generally, the facts upon which the government would rely to establish venue in this district on that basis.

Subdivision 5: The government may state any additional facts, not included by way of response to the requirements of subdivisions 1–4, above, upon which it relies to establish venue in this district as to Count 4.

Doc. no. 672, at 3–5.

The order for Bill of Particulars No. 1 directed that the government respond as to each count separately, and, for those counts involving more than one defendant, as to each defendant separately. *Id.* at 2. Desiring to leave no doubt as to the issues to be addressed with the benefit of Bill of Particulars No. 1, the court noted that:

At the January 9, 2014 motion hearing, the court observed that, under 18 U.S.C. § 1957 (money laundering) and § 1956(i)(1)(B) (money laundering venue), the focus is on discrete transactions, for which reason it should be understood that a factual showing as to general involvement in the alleged criminal activities that generated the money that originated, wholly or in part, from this district may not be sufficient. On this point, the government suggested, in substance, that it should be sufficient to show, for venue purposes (as to the substantive money laundering counts), that, as a result of the overall course of criminal activity alleged in the indictment, funds were generated from Oklahoma and other places, the funds went offshore (the government referred to Panama) and were commingled with other funds, and [ ] funds were then brought back into the United States from offshore for purposes of the money laundering transactions alleged in Counts 4–16. Transcript of January 9, 2014 hearing, at 91–96. To the extent that the government relies on this approach to establishing venue as to the substantive money laundering counts, it appears that the commingled funds flowing out of the United States and then back would be funds that were generated by the overall course of criminal activity alleged in the indictment (presumably including criminal activity in this district). Nevertheless, the court is uncertain as to whether the government relies exclusively on this approach—generalized involvement in criminal activity, including criminal activity in this district (generating proceeds of unlawful activity which formed some portion of the laundered funds, or of which the laundered funds were a part)—to establish venue in this district as to Counts 4–16, as opposed to showing that the defendant directly and identifiably "participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(B). Moreover, the government's exclusive reliance on such an approach could presumably vary from one count to the next (or, within

those counts having more than one defendant, from one defendant to the next).

Doc. no. 672, at p. 5, n. 2.

The government filed Bill of Particulars No. 1 on January 31, 2014. Doc. no. 694. In the face of the plain terms of the order for Bill of Particulars No. 1, the government characterized the format required by the court's order as a "request." *Id.* at 1. The government then proceeded to substantially ignore the court's "request." [9] The bill of particulars does give an informative general overview of the factual scenario the government plans to present at the trial of this case. To the extent that it provides any "particulars" at all, it describes transfers of funds that have no discernable connection with any of the transactions charged in Counts 4–16.

## C. The flow of funds.

An understanding of the flow of the funds generated by the Legendz enterprise, as limned by the government, is key to an understanding of the government's theory of venue for Counts 4–16.

Individual bettors in "a vast operation spanning most of the United States," doc. no. 694, at 15, were the consumers of the services offered by the Legendz enterprise. Bettors could either establish a cash balance on the books of Legendz ("post

up") or, with prior approval, bet on credit. *See, generally,* the transcript of the April 3, 2014 James hearing, doc. no. 765, at 232–37. Either way, funds flowed from individual bettors to Legendz, often with the intermediation of local agents (some of whom are defendants in this case) who would collect and remit the money. *Id.* The betting operation itself is the subject of Count 1, charging a RICO conspiracy, and Count 2 (illegal gambling business). Thus, the government asserts that "Counts 1 and 2 are the specified unlawful activities underlying these substantive money laundering counts, and therefore 'tainted' proceeds from those SUAs were received and commingled into the Panamanian bank accounts in the names of shell companies, and those combined illegal proceeds, including those from the Western District of Oklahoma, represent the source of the monetary transactions charged." Doc. no. 694, at 17.[10] Funds from "over 40 states, including the Western District of Oklahoma," doc. no. 694, at 2, would accordingly be aggregated in Panama. Funds would then return to the United States, as needed for purposes of, for instance, buying a $14,385.59 Harley Davidson motorcycle from a Florida dealer so that it could be used "as a promotional giveaway." *See,* Count 10, doc no. 354, at 62 and doc. no. 712, at 3. The government acknowledges

---

9. The government's all-but-complete disregard of the court's order is wholly inexplicable, but some aspects of that disregard are more egregious than others. For instance, the order directed (as to each of the substantive money laundering counts and each of the substantive money laundering defendants, taking Count 4 as an example) that: "If the government does not contend that King directly participated in one or more identifiable transactions totaling $42,142.26 by which that sum was transferred from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted, *the government shall so state.*" Doc. no. 672, at 4 (emphasis added). The govern-

ment did not, as to any count or any defendant, respond to this requirement. (The court will note, however, that the government's disregard for the court's order does not, as such, influence the court's decision with respect to these motions to dismiss the substantive money laundering counts. This order is based on the merits of the defendants' motions and the government's responses thereto, and not on any other considerations.)

10. At least for purposes of the present motions, this basic scenario is not contested by the defendants. Indeed, this scenario lies at the heart of the defendants' arguments with respect to venue.

that the money laundering transactions did not occur in the Western District of Oklahoma. Doc. no 598, at 2; doc. no. 599, at 2.

Thus, given the government's theory of venue as to the substantive money laundering counts, it comes as no surprise that the Bill of Particulars No. 1 does not identify a single transfer of funds from Oklahoma in any amount corresponding to the dollar amounts specified in any of Counts 4–16.[11] For present purposes, the court does not exclude the possibility that a laundering transaction could occur outside of this district, consisting of funds transferred in smaller amounts from this district in identifiable transactions (or, for that matter, consisting of funds constituting a portion of a larger sum transferred from the Western District of Oklahoma). It is nevertheless noteworthy that the bill of particulars does not identify any transfer of funds from this district in an amount that squares with any of the amounts charged in the counts at issue here. Nor does the government assert, in the Superseding Indictment, in the Bill of Particulars, or otherwise, (i) that any of the specific transactions listed in Counts 4–16 had anything to do with the Western District of Oklahoma, or with any financial institution in this district, (ii) that any of the transactions comprising the laundering offenses charged in Counts 4–16 were begun, continued or completed in this district, or (iii) that any funds identifiably connected with the charged transactions were—by any person, money laundering defendant or not—transferred out of or through the Western District of Oklahoma to the recipients listed in Counts 4–16.

Bill of Particulars No. 1 is replete with descriptions of situations in which funds originated from Oklahoma (among other places), but in none of those instances does the government tie the transactions, or other activities, by which funds moved out of Oklahoma to any of the transactions charged in Counts 4–16. *See, e.g.,* doc. no. 694, at 4, 5, 7, 9, 12, 13.

Finally, it should not go unnoticed that, under the government's commingling theory, any of these defendants could be held to answer for the substantive money laundering offenses charged in Counts 4–16 in any of more than forty states. Under the government's theory, it is sufficient that some unidentified and untraced fraction of the money involved in the charged money laundering transaction may have originally been collected from a bettor in the Western District of Oklahoma.

## V.

### Analysis

#### A. Introduction.

The Constitution speaks, in two places, to the matter of venue in federal criminal cases. As Justice Frankfurter wrote in United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236 (1944):

Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers wrote into the Constitution that "The Trial of all Crimes * * * shall be held in the State where the said Crimes shall have been committed * * *." Article III, § 2, cl.3. As though to underscore the

---

11. The bill of particulars does describe one dollar amount that matches a dollar amount specified in one of the substantive money laundering counts. The bill, at paragraph 14, says that approximately two years ago, defendant Myler "picked up $20,000 to $25,000 in cash" in Oklahoma City, doc. no. 694, at 7, and Count 8 refers to a $25,000 transaction.

Superseding Indictment, at 61. But the government says the source of the $25,000 referred to in Count 8 was "rental deposits." Doc. no. 713, at 6. The government has not asserted that the funds described in the bill at paragraph 14 are the funds referred to in Count 8.

importance of this safeguard, it was reinforced by the provision of the Bill of Rights requiring trial "by an impartial jury of the State and district wherein the crime shall have been committed." Sixth Amendment.

*Id.* at 275, 65 S.Ct. 249.

██ The constitutional and fairness implications of criminal venue require that venue provisions be narrowly construed. *See, e.g.,* United States v. Jefferson, 674 F.3d 332, 365 (4th Cir. 2012) ("It is settled that, in a criminal case, venue must be narrowly construed," citation omitted), *cert. denied,* 568 U.S. 1041, 133 S.Ct. 648, 184 L.Ed.2d 482 (2012). And:

> If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it.

Johnson, 323 U.S. at 276, 65 S.Ct. 249.

And it is worth mentioning, even though this case presents no close issues of statutory construction, that the admonition in Johnson has been noted repeatedly by our Court of Appeals, *e.g.,* United States v. Acosta–Gallardo, 656 F.3d 1109, 1118 (10th Cir. 2011) (noting the "unfairness and hardship to which trial in an environment alien to the accused exposes" a defendant, citing Johnson and quoting from United States v. Medina–Ramos, 834 F.2d 874, 875 (10th Cir.1987)).

In the case at bar, the government originally relied entirely on 18 U.S.C. § 1956(i)(1)(B) to establish venue in the Western District of Oklahoma for the substantive money laundering counts. Doc. no. 620, at 2. The government now cites that section, as well as § 1956(i)(3) and 18 U.S.C. § 3237(a). The government also augments its arguments by pointing out that Counts 4–16 also include a reference to 18 U.S.C. § 2 (aiding and abetting).

Thus, the underpinnings of the government's contentions with respect to venue for these counts may be concisely summarized as follows:

- Counts 4 through 16 charge continuing offenses for which venue is authorized by 18 U.S.C. § 1956(i)(1)(B) and § 1956(i)(3) as well as 18 U.S.C. § 3237(a).

- The defendants charged in these counts are also charged with the specified unlawful activities which generated the laundered funds.

- These defendants are also charged with aiding and abetting money laundering.

- Money which funded the money laundering transactions in other states came from various off-shore accounts; that money flowed into these off-shore accounts from across the United States including the Western District of Oklahoma; the fact that some money in these accounts came from Oklahoma "tainted" all of the money in these accounts with that same jurisdiction of origin. This "tainting" theory satisfies the requirement of § 1956(i)(1)(B) that the defendant participate in the transfer of the proceeds of the specified unlawful activity from the Western District of Oklahoma to the district where the financial or monetary transaction was conducted.

- Finally, throughout its papers, the government relies on its ability to distinguish the charges in this case from the charges in United States v. Cabrales, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998), thereby taking this prosecution out of the ruling in Cabrales. The government contends that (i) the fact that aiding and abetting charges are included in the mon-

ey laundering counts, (ii) the fact that the money laundering defendants are also charged in Counts 1 and 2 (and that Count 2 includes aiding and abetting), and (iii) the fact that some allegations from Counts 1 and 2 are incorporated in the money laundering counts, combine to take this case out of the holding of Cabrales.

Although the government asserts, correctly, that the Supreme Court's unanimous 1998 decision in United States v. Cabrales, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998), is distinguishable in some ways from the case at bar,[12] the parties' statutory contentions have been made, and must be considered, against the backdrop of Cabrales. It is also true, as will be seen, that the case at bar involves a significant post-Cabrales statutory enactment. Even so, both the government and the movants quite understandably cherry pick the Court's opinion in Cabrales for helpful passages. At least at a high level of generality, Cabrales does provide guidance. The court will accordingly begin there.

**B.** *Cabrales* **and the post-***Cabrales* **enactment of § 1956(i)(1)(B).**

Three years before § 1956(i)(1)(B) was enacted, the Supreme Court handed down its decision in Cabrales. In Cabrales, the defendant was indicted in Missouri on charges of money laundering conspiracy, conducting a transaction to avoid a money laundering requirement, and substantive money laundering. The defendant challenged venue as to the latter two counts (under §§ 1956 and 1957, respectively) under Article III, § 2 of the Constitution, as well as under the Sixth Amendment, and under Rule 18, F.R.Crim.P. The Court explained the context for its decision as follows:

The laundering alleged in the indictment occurred entirely in Florida. The currency purportedly laundered derived from the unlawful distribution of cocaine in Missouri. The defendant, respondent Vickie S. Cabrales, is not alleged to have transported funds from Missouri to Florida. Nor is she charged, in the counts before us, with participation in the Missouri cocaine distribution that generated the funds in question.

524 U.S. at 3–4, 118 S.Ct. 1772.

In concluding that venue for the substantive money laundering count was not properly laid in Missouri, the Court agreed with the Eighth Circuit that the fact that "the money came from Missouri is of no moment" because "Cabrales dealt with it only in Florida." *Id.* at 5, 118 S.Ct. 1772 (internal quotation marks omitted). The Court rejected the government's contention that venue would be proper in the district in which the funds were unlawfully generated even if the laundering transaction occurred wholly within another district. *Id.* The court explained that the first step in resolving the venue issue is to determine where the crime was committed—the *locus delicti. Id.* at 6–7, 118 S.Ct. 1772. This must be determined from the nature of the crime and the location of the act or acts constituting it. *Id.* On this point, the Court noted that the money laundering counts "interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds allegedly laundered." *Id.* at 7, 118 S.Ct. 1772.

So far, so good from the defendant's perspective. But the government points out that the Court, in Cabrales, went on to note that "the counts at issue do not charge Cabrales with conspiracy; they do not link her to, or assert her responsibility for, acts done by others. Nor do they charge her as an aider or abettor in the

---

**12.** Doc. no. 693, at 11 (Government says Cabrales is "vastly different" factually).

Missouri drug trafficking. See 18 U.S.C. § 2 (one who aids or abets an offense 'is punishable as a principal')." *Id.* at 7, 118 S.Ct. 1772. These observations, about situations not then before the Court, counsel against reflexive application of the Court's broad pronouncements in Cabrales.[13]

Although the decision in Cabrales drew some criticism, the legislation that became the October 2001 amendment [14] to § 1956 has been described as "essentially codify[ing] the result in Cabrales." Jennifer Herring, Note, *Selecting an Appropriate Venue for Money Laundering Prosecutions*, 69 Geo. Wash. L. Rev. 293 at 307 n. 109 (2001) (citing proposed legislation filed in June, 2000 that included the language now present in § 1956(i)(1)(B)). As sometimes happens with legislative codifications of judicial decisions, the legislative product may in some respects be more rigid than was the judicially-created principle the legislature intended to codify.

 In enacting § 1956(i)(1)(B), Congress placed a condition on the government's right to charge a money launderer in (in the language of the statute) "any district where a prosecution for the underlying specified unlawful activity could be brought." *Id.* In Cabrales, the Court clearly rejected the government's contention that it had that much leeway in choosing the venue for the money laundering counts at issue in that case. Cabrales, 524 U.S. at 5, 118 S.Ct. 1772. The condition imposed by Congress is as follows: The money laundering charge may be prosecuted in the district where the specified unlawful activity may be prosecuted *if* "the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(B). The fair and logical upshot of this provision is that a substantive money laundering defendant exposes himself to prosecution in some far away district only if he creates a nexus with that district by "participat[ing] in the transfer of the" tainted proceeds out of that district. And it is important in this case to bear in mind that the defendant's activities, if any, that created the taint in the first place must not be confused with— or equated with—defendant's participation in the transfer of the tainted funds. The laundering and the underlying offense are separate offenses: "[A] money-laundering transaction must be separate and apart from the completed predicate offense generating the proceeds used in the money-laundering transaction." United States v. Huff, 641 F.3d 1228, 1233 (10th Cir. 2011). (The Tenth Circuit's "completed predicate offense" is the Supreme Court's "anterior criminal conduct that yielded the funds allegedly laundered." Cabrales, at 7, 118 S.Ct. 1772.) *Cf.*, United States v. Kennedy, 64 F.3d 1465, 1478 (10th Cir. 1995) ("Congress clearly intended the money laundering statutes to punish new conduct that occurs after the completion of certain criminal activity, rather than simply to create an additional punishment for that criminal activity.").

13. In an argument with which the court agrees, Athanas asserts that the government misreads Cabrales by ignoring the fact that, in her opinion for the Court, Justice Ginsburg was careful to note, repeatedly, that the Court was addressing only "the counts at issue" or "the counts before us," thus making it clear that the presence of a conspiracy charge elsewhere in the indictment, and the possibility that the defendant could have been charged as an aider and abetter, did not affect the status of "the counts at issue" for venue purposes. Doc. no. 700, at 8–9. But it is not necessary for the court to parse Cabrales as closely as Athanas does, because, in the court's view, subject to the overarching constitutional import of Cabrales, the controlling sources of authority for purposes of the present motions are statutory, as is discussed at length in this order.

14. Pub.L. 107–56, § 1004.

At least for purposes of the motions now before the court, venue under § 1956(i)(1)(B) depends on the answers to two questions: (1) Were the tainted proceeds transferred from the venue district (the sending district) to the district where the laundering transaction was conducted (the receiving district)? (2) Did the defendant participate in the transfer of the laundered proceeds from the sending district to the receiving district? Taking Count 13 as an example, § 1956(i)(1)(B) authorizes prosecution of Mr. Athanas (a New Hampshire resident [15]) in the Western District of Oklahoma under § 1957 "if [Spiros Athanas] participated in the transfer of the proceeds of the specified unlawful activity from [the Western District of Oklahoma] to the district where the financial or monetary transaction is conducted [the District of New Hampshire]."

In the same vein, a look at Count 11 is also instructive, because (despite the requirements of the court's order for Bill of Particulars No. 1) Count 11 is the only substantive money laundering count specifically addressed in Bill of Particulars No. 1. *See*, doc. no. 694, at 10. But before looking at Count 11, it should be noted that Bill of Particulars No. 1 asserts that: "The following facts show that the monetary transactions in the counts at issue consisted of proceeds derived from those illegal activities in various states, including

Oklahoma." Doc. no. 694, p. 3. None of the facts which follow this statement link any dollars involved in any alleged money laundering offense with any dollar "derived from" Oklahoma or with any "participat[ion]" by any of these substantive money laundering defendants "in the transfer of the proceeds of the specified unlawful activity from [the Western District of Oklahoma] to the district where" the transaction was conducted. Thus, as to Count 11, the bill states that defendant Buonnano sent weekly spreadsheets to Luke King showing the weekly income of Legendz agents in the United States, and that Buonnano was responsible for collecting cash payments from U.S. customers and delivering the proceeds to King. *Id.* at 9. The bill then says that emails show that Luke King directed Legendz staff and codefendants to make payments for his personal benefit, such as the transaction charged in Count 11. *Id.* at 10. But the bill makes no attempt to show that any of the money involved in Count 11 was ever present in the Western District of Oklahoma or that the Count 11 defendant, Luke King, participated in "*the* transfer" out of the Western District of Oklahoma of "*the* proceeds," [16] 18 U.S.C. § 1956(i)(1)(B) (emphasis added), involved in the transaction charged in Count 11.

■ The government's showing [17] with respect to Count 11, such as it is, is the

15. Doc. no. 798, at 75 (testimony of Special Agent Michael Dwyer).

16. As has been noted, in the court's view, resort to preferential rules of construction (*see*, Part V (A), above) is not needed in order to aid the resolution of the venue issues now presented. However, the court cannot but note that the government's commingling theory gives no effect to Congress's specific requirement, in § 1956(i)(1)(B), of the defendant's participation in "the" transfer of "the" tainted proceeds from the venue district to the district where the laundering transaction is conducted.

17. Of course, the government is not required, at this stage, to *prove* venue. Averments are enough. The purpose of the order for Bill of Particulars No. 1 was to require the government to aver facts which, if proven at trial, would suffice to establish venue. This is an appropriate use of a bill of particulars where there is a serious question as to venue. See, *e.g.*, United States v. Honneus, 508 F.2d 566, 570 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, *abrogated on other grounds*, United States v. Christensen, 732 F.2d 20, 23 n. 5 (1st Cir.1984) (defendant, had he asked, would have been entitled to a bill of particulars with respect to facts relevant to venue);

high water mark in terms of facts or transaction-specific assertions that might support venue in the Western District of Oklahoma under § 1956(i)(1)(B) for any of the substantive money laundering counts. And the cases relied upon by the government in its analysis under Cabrales and § 1956(i)(1)(B) all have one thing that the case at bar does not: a legally relevant connection between the substantive money laundering defendants (or their activities) and the venue district.

The government first cites United States v. Totaro, 40 Fed.Appx. 321 (8th Cir. 2002), cert. denied, 537 U.S. 1141, 123 S.Ct. 936, 154 L.Ed.2d 838 (2003). Perhaps because the court's opinion was unpublished, the opinion does not dwell at length on the facts bearing on the substantive money laundering venue issue in that case. The case came to the Eighth Circuit from the District of South Dakota. The government's operative pleading was the Second Superseding Indictment. United States v. Totaro, CR–99–40137 (D.S.D.), doc. no. 80 (filed March 21, 2000). Disregarding boilerplate references to South Dakota, it is reasonably clear that South Dakota was a point of origin, or at least a transit point, for the laundered funds,[18] that South Dakota was a focal point for the "anterior criminal conduct,"[19] Cabrales, at 7, 118 S.Ct. 1772, and perhaps most important for present purposes, the government was not relying on a commingling theory to tie the laundering transactions to the venue district.

In United States v. Nichols, 416 F.3d 811 (8th Cir. 2005), the defendant in question was "charged with causing money obtained by fraud to be transported from Missouri [where the prosecution was brought] to California," id. at 824, which clearly satisfied the limitations laid down in Cabrales, and equally clearly differentiates that case from the case at bar. In the case at bar, none of the substantive money laundering defendants are accused of causing the laundered funds to be transported from the Western District of Oklahoma to the districts where the laundering transactions occurred.[20] To the contrary, the government asserts (with plausible evidentiary support) that the money went from forty districts (including this district) to Panama, there to repose until it was needed for any of a wide variety of purposes.

Likewise, United States v. Lewis, 2006 WL 1579855 (D. Minn. June 1, 2006) and

United States v. Trie, 21 F.Supp.2d 7, at 17 (D.D.C. 1998); United States v. Castellano, 610 F.Supp. 1359, 1388 (S.D.N.Y. 1985) (court may require a sworn bill of particulars to enable the government to establish venue). As stated in Castellano, "The government must present its theory for justifying venue for trying count 4 in this district before a final determination of its propriety is made." Id. at 1390–91.

18. United States v. Totaro, CR–99–40137 (D.S.D.), doc. no. 80 (Second Superseding Indictment filed March 21, 2000), at p. 5 (¶ 19), pp. 9–12.

19. Id., p. 3 (¶ 10), p. 6 (¶ 19), pp. 9–12, p. 19, ¶ 67.8.

20. Section 1956(i) was enacted while the prosecution in Nichols was pending. The court observed, in a footnote, that venue would also be appropriate under "§ 1956(i)(B)" [sic—presumably (i)(1)(B) ]. Nichols, 416 F.3d at 824 n. 7. This observation was not accompanied by any discussion or analysis, but it is clear from the Superseding Indictment in Nichols that the substantive money laundering counts, charged under § 1956(a)(1)(B)(i), were based on transfers of the funds actually used in the charged substantive money laundering transactions from various banks in the Western District of Missouri to California. See, United States v. Nichols, No. 02–0014 (W.D. Mo.), doc. no. 15, pp. 17–18 (Count Sixteen), 18–20 (Count Seventeen), 20–22 (Count Eighteen), 22–24 (Count Nineteen), 24–25 (Count Twenty) and 26–27 (Count Twenty-One).

United States v. Wittig, 425 F.Supp.2d 1196 (D. Kan. 2006), *rev'd on other grounds sub nom.* United States v. Lake, 472 F.3d 1247 (10th Cir. 2007), cited by the government (doc. no. 700, at 18), lend no support to the government's position. In Lewis, the defendants' venue challenge was apparently based entirely on Cabrales, and not on statutory grounds. Lewis, *id.*, at *10–*13. Having pitched their argument on Cabrales, it was sufficient that "[d]efendants are charged with the transportation of funds from Minnesota [the venue district] either directly or through an aider and abettor and they are charged with participation in the fraud occurring in Minnesota which generated the funds they are alleged to have laundered." *Id.* at *13. And in Wittig, the defendant himself acquired the laundered asset (capital stock) in the venue district and transferred it himself from that district to the district where the charged transaction occurred. *Id.* at 1220.

In sum, the government has fallen short as to both of the questions that must be answered under § 1956(i)(1)(B) with respect to Counts 4–16: (1) The government has not shown that the tainted proceeds that were laundered in the receiving districts were transferred to those districts from the Western District of Oklahoma. (2) The government has not shown that the charged defendants participated in the transfer of the laundered proceeds from this district to the receiving districts where the charged transactions occurred. As is discussed below, the government argues that other provisions come to the rescue.

## C. The effect of § 1956(i)(3).

The government asserts, with virtually no developed argument, that § 1956(i)(3) bolsters its case for venue. Doc. no. 693, at 9–10; doc. no. 694, at 15–16. That section states as follows:

> (3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.[21]

Although the gist of the government's argument under this provision is not clear, the government seems to suggest that the reference to a "continuing transaction" should be held to reach back to the illegal gambling activities in the venue district so as to tie the laundering transaction to those activities. Doc. no. 693, *id.* The government's reliance on this subsection is misplaced because, plainly, the only "transfer" contemplated by this provision is a transfer integral to the laundering activity and the "funds" contemplated by this provision are the funds laundered in the charged transaction—not funds that may have been generated at some other time in some other state and then sent to Panama, aggregated with funds from any of thirty-nine other states, and then sent back to the United States for various purposes, including, perchance,[22] a transaction charged in Counts 4–16. To the extent that this subsection of the venue provision makes available any district that would not otherwise be a permissible venue, it permits prosecution in any district in which

---

**21.** As a subdivision of § 1956(i), this provision was enacted as part of the new subsection (i) (including (i)(3)B)) in October, 2001. Pub.L. 107–56, § 1004.

**22.** Based on its investigation, the government concludes that the Legendz enterprise "gener-

ated billions of dollars of revenue," and that "millions of dollars [were] funneled into its offshore bank accounts every week." Doc. no. 137, at 3; doc. no. 694, at 15. The sum total of the transactions involved in Counts 4–16 is about $1.2 million ($1,096,733.56).

"the transaction" takes place. What transaction? The "transaction" is "a transfer of funds from 1 place to another" and is deemed a "single, continuing transaction" under this language.[23]

The government has not averred, in the Superseding Indictment or in Bill of Particulars No. 1, that identifiable funds originating from the Western District of Oklahoma were transferred out of this district for purposes of any of the transactions charged in Counts 4–16 and then were included in any of the charged substantive money laundering transactions. To the contrary, the government says that the proceeds of the illegal activities in forty states were sent to Panama and commingled. But if there is no identifiable transfer of tainted funds *discernibly connected with the charged laundering transaction* from one place to another place, there can be no "continuing transaction" for purposes of this provision and no basis for a suggestion that any of the defendants in Counts 4–16 conducted "any portion of the transaction."

**D. The effect of § 3237(a).**

Under 18 U.S.C. § 3237(a):

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enact-ment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

The government advances its argument under § 3237(a) as follows:

Post–Cabrales rulings consistently have held that money laundering in violation of § 1957 is a continuing offense implicating the venue provisions of 18 U.S.C. § 3237(a) when, unlike the circumstances in Cabrales but like those here, defendants participated in, or aided and abetted others in participating in, the transfer of funds derived from specified unlawful activity across districts. See United States v. Black, 469 F.Supp.2d 513, 540–41 (N.D. Ill. 2006); United States v. Dupre, 117 F.3d 810, 822 (5th Cir. 1997); Lewis, 2006 WL 1579855, at *13; United States v. Logan, 2013 WL 2147887 (E.D. Va.), at *3. Cases following enactment of the venue statute at § 1956(i) in 2001 also "reinforce that prosecutions in the district from which money was taken are proper where the defendant—as here—participated in funds transfer out of the prosecuting district." [United States v.] Logan, 2013 WL 2147896 at *2 (citing Nichols, [United States v.] Shepard [2004 WL 1752592 (D. Kan. 2004)], [United States v.] Anderson [2006 WL 1580023 (D. Minn. 2006)], Lewis, and United States v. Wittig, [425 F.Supp.2d 1196, 1220–21] 2006 WL 851473 (D. Kan.), at *16).

Doc. no. 693, at 9 (Government's Memorandum of Law in Support of Bill of Particulars No. 1).

As a preliminary matter, the court notes that the government's two citations to

---

**23.** This concept, making a transfer that may involve several districts a "single, continuing transaction," is not new. *See, e.g.* Armour Packing Co. v. United States, 209 U.S. 56, at 76, 28 S.Ct. 428, 52 L.Ed. 681 (1908)

("[T]ransportation equally takes place over any and all of the traveled route, and during transportation the crime is being constantly committed.")

United States v. Logan are *citations to government briefs in that case*, and not—as would appear from the quoted passage from the government's memorandum—citations to judicial decisions. To say no more, the court will simply observe that, having received and read the seventy-two briefs and memoranda filed by the government so far in *this* case, the court has no inclination to read briefs filed by the government in other cases.[24]

As relevant to this case, the only "offense" contemplated by § 3237(a) is a substantive money laundering offense—one of those charged in Counts 4–16. The Court made it clear in Cabrales that, under § 1957, the focus is on financial transactions, not on overall courses of conduct (although a transaction might be treated as a continuing offense if *the launderer* acquired the funds in one district and transported them into another). Cabrales, at 7–8, 118 S.Ct. 1772. The government's repeated attempts to sustain venue in this district for the substantive money laundering counts on the basis of the defendants' alleged involvement in the underlying criminal activities is unpersuasive, and the government's reliance on § 3237 does not make those activities any more relevant than they would otherwise be.

[M]oney laundering crimes are not continuing offenses simply because "all the actions are interwoven," as asserted by the Government. Instead, they are continuing offenses, if at all, because the financial transactions (1) were begun in one district and completed in another or (2) committed in more than one district. 18 U.S.C. § 3237.

Despite the Government's assertions to the contrary, the anterior criminal activities in themselves, even for continuing offenses, are not relevant.

United States v. Mikell, 163 F.Supp.2d 720, 738 (E.D. Mich. 2001), *rev'd on other grounds, as to other counts*, 84 Fed.Appx. 485 (6th Cir. 2003), *cert. denied*, 541 U.S. 1044, 124 S.Ct. 2185, 158 L.Ed.2d 735 (2004).

The government does not intimate, either in the Superseding Indictment or in Bill of Particulars No. 1, that any of the transactions charged in Counts 4–16 were "begun, continued, or completed" in the Western District of Oklahoma, or that any of those transactions otherwise had anything to do with the Western District of Oklahoma aside from Oklahoma's status, along with thirty-nine other states, as a state from which tainted proceeds were generated and sent to Panama.[25] Thus, as

24. The government's first Logan citation is to a government brief in opposition to a defense motion that was denied without prejudice. *See*, United States v. Logan, No. CR–12–506, E.D.Va., doc. nos. 50, 54 and 58. The government's second Logan citation is to a government brief in opposition to a defense motion that was withdrawn and never ruled on by the court. *See*, *id.*, doc. nos. 25, 27 and 47, and United States v. Logan, 2013 WL 1450547, E.D. Va. April 4, 2013, at *1.

25. With respect to Counts 13–16 (Athanas), there is yet another layer of insulation between the Western District of Oklahoma and the alleged laundering. *See*, doc. no. 717, at 7–8. The government asserts that Athanas had an account in Jamaica that was used to deposit the proceeds of *his* gambling businesses. (As to Athanas's *separate* gambling businesses, *see*, the transcript of the James hearing, doc. no. 823, at 482–85.) The government avers that this account would have received "book-to-book" transfers from Legendz. Doc. no. 717, at 7. (A book-to-book transfer is a transfer from one bookmaker to another, to pay an amount due from one bookmaker to the other, or to settle the obligation of a common bettor—*see*, James hearing transcript, doc. no. 823, at 51–52, 135–36, 239–40.) The theory then posits that the funds flowing into Athanas's New Hampshire account—ultimately expended in the charged laundering transactions—would necessarily have included tainted proceeds from Legendz (originating with Legendz operations in one or more of

pointed out by Athanas, the government has not asserted "that anyone conducted a transaction that began in the Western District of Oklahoma and concluded in New Hampshire or Massachusetts." Doc. no. 700, at 16, n.4.[26]

On these facts, § 3237, on its face, is of no help to the government. And the cases relied upon by the government, doc. no. 693 at 9, do nothing to fill the void. United States v. Black, 469 F.Supp.2d 513 (N.D. Ill. 2006), cited by the government, is a good example of how § 3237 can make a difference—for reasons that were present in that case but are not present in the case at bar. The laundering transaction, charged under § 1957, involved a transfer of funds from Toronto to Chicago. Id. at 537. Applying § 3237(a), the court concluded that "[b]ecause the monetary transaction at issue was completed when it was transferred to the account in Chicago, venue is proper here." Id. at 540. The court thus relied upon § 3237(a) to conclude that venue in the Northern District of Illinois was proper under § 1956(i)(1)(A), which is not involved in the case at bar.[27] Moreover, in Black, unlike the case at bar, there was no issue at all as to the provenance, under § 1956(i)(1)(B), of the funds used in the charged laundering transactions. Commingling was not involved.

In United States v. Dupre, 117 F.3d 810 (5th Cir. 1997), also cited by the government, the venue district was the Eastern District of Louisiana. The money laundering counts, charged under § 1957, involved the transfer of funds from that district to accounts in the Cayman Islands and elsewhere. Id. at 821. The underlying criminal

---

forty states), via Athanas's separate Jamaica account, because of the book-to-book transfers that occurred from time to time between Legendz and Athanas's separate bookmaking operation. Doc. no. 717, at 7–8. Necessarily implied in the government's reliance on 18 U.S.C. § 3237(a) is a contention by the government that these money laundering transactions were "begun, continued, or completed" in the Western District of Oklahoma.

26. As has been noted, the government concedes that the money laundering transactions did not occur in the Western District of Oklahoma. Doc. no 598, at 2; doc. no. 599, at 2. Various papers filed by the government in this case (but not the bill of particulars) provide particulars as to some of the substantive money laundering transactions. For instance, the property involved in Count 5 is in Spring, Texas (Superseding Indictment, at 68, ¶ 112(3)) and the bank account was at Wachovia Bank in the Woodlands, Texas (doc. no. 713, at 5). The property involved in Counts 6 and 7 was in the Woodlands, Texas (Superseding Indictment, at 68, ¶ 112(4)). The bank account for Count 6 was the Wachovia account in Texas and the bank account for Count 7 was in Panama (doc. no. 713, at 4). So far as is shown by the record, the pattern is the same for the other substantive money

laundering counts. See, e.g., Superseding Indictment, at 68, ¶ 112(7) with respect to Count 8; doc. no. 713, at 4, 6 with respect to Count 9; doc. no. 712, at 2 with respect to Count 10; and doc. no. 717, at 7 with respect to Counts 13–16 (funds came "primarily" from Athanas's account in Jamaica—e.g., funds flowed from Jamaica to Laconia, New Hampshire (Designworks), with no indication that the transactions had any nexus with the Western District of Oklahoma).

27. That alone was sufficient to establish venue. But the court, as best as can be determined from the reported opinion, went on to conclude that venue was also appropriate under § 1956(i)(1)(B) because "the Indictment alleges that Defendant Black participated in the transfer of the proceeds of the specified unlawful activity from Canada to Chicago— the District where the transaction at issue was conducted." Id. at 540. This aspect of the Black decision, although irrelevant to the case at bar, is hard to square with the focus, under § 1956(i)(1)(B), on a transfer from the venue district. It is sufficient to note, for present purposes, that analysis under § 1956(i)(1)(A) was really the beginning and end of the story in Black, and (more importantly) that, in the case at bar, the government does not rely on any transfers to this district.

activity (bank fraud) clearly occurred in the venue district, *id.* at 822, and all of the laundered funds came, by virtue of the underlying fraudulent transaction, directly to defendants, who turned around and put the money in their accounts in the Cayman Islands and elsewhere. *Id.* And in United States v. Lewis, 2006 WL 1579855 (D. Minn. June 1, 2006), the only challenge to venue was a constitutional challenge under Cabrales, *id.* at *11, *13, which was found wanting because the facts did not align with the decisive facts in Cabrales—the defendants in Lewis were charged with transportation of the funds from the venue district and with participating in the underlying fraud in the venue district. *Id.* at *13.[28]

Because, in the counts at issue, no *laundering* transaction (not be confused with the underlying criminal activity) has been alleged to have had any connection with this district, it does the government no good to cite a statute which spells out the venue consequences of a transaction "begun, continued, or completed" in this district. *Cf.,* United States v. Smith, 641 F.3d 1200, 1208 (10th Cir. 2011) (Cabrales recognized that "money laundering may be a continuing violation where *the launderer* transports money across state lines." Emphasis added.).

### E. Aiding and abetting under 18 U.S.C. § 2.

The government argues that the fact that the defendants are charged "with aiding and abetting Counts 4 through 16 under [18 U.S.C.] § 2, brings the venue

challenge outside the scope of the Court's decision in Cabrales." Doc. no. 693, at 5. The Cabrales decision certainly does provide guidance, but the dispositive question presented by these motions is whether the government has brought itself with the later-enacted *statutory* venue provision. If the venue selected by the government is not authorized by statute, the constitutional restrictions imposed (and any licenses implicitly granted) by the decision in Cabrales are of no moment.

At the outset, the record must once again be set straight. In support of its aiding and abetting theory, the government asserts that:

> [I]n United States v. Smith, 198 F.3d 377 (2d Cir. 1999), defendant's venue challenge was unsuccessful, as he was charged with aiding and abetting substantive extortion and money laundering charges. The court ruled that "[v]enue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred," citing United States v. Bozza, 365 F.2d 206, 221 (2d Cir. 1966).

Doc. no. 693, at 10.

The government apparently means to suggest to the court that venue for money laundering may be laid where venue for the "underlying crime" may be laid and that the aiding and abetting charge brings these moving defendants within the circle of those who may be called to account in the Western District of Oklahoma. There are three problems with this. First, contrary to the government's representation,

---

**28.** The government cites, with very little discussion of the application of § 3237(a) in the case at bar, a passage from United States v. Totaro, 40 Fed.Appx. 321 (8th Cir. 2002), *cert. denied,* 537 U.S. 1141, 123 S.Ct. 936, 154 L.Ed.2d 838 (2003), that cites § 3237. Doc. no. 693, at 5. Totaro contributes nothing to the § 3237 analysis in the case at bar because, "Totaro's criminal scheme began with

the transfer of funds from bank accounts in South Dakota [the venue district] to his lending institutions." *Id.* at 323. Thus, as has been noted (Part V (B), above), it is reasonably clear that South Dakota was a point of origin, or at least a transit point, for the laundered funds and that South Dakota was a focal point for the underlying criminal activities.

quoted above, <u>Smith</u> did not involve any money laundering charge at all.[29] Second, there are no cases, applying any combination of § 1956(i), § 3237 and § 2, that stand for the proposition that the government incorrectly says <u>Smith</u> stands for. Third, the government's contention is foreclosed by the statutory language itself.

 To start at the beginning, the elements of criminal liability for money laundering under § 1957 are that the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity. <u>United States v. Lake</u>, 472 F.3d 1247, 1260 (10th Cir. 2007). To be convicted as an aider and abetter of money laundering, a defendant must be shown to have (1) willfully associated himself with the criminal venture and (2) sought to make the venture succeed through some action of his own. <u>United States v. Adegboye</u>, 732 F.3d 1195, 1198 (10th Cir. 2013). And for purposes of determining criminal liability for aiding and abetting money laundering—or venue for a charge of aiding and abetting money laundering—the only relevant "criminal venture" is the money laundering. Judge Brorby's opinion in <u>United States v. Torres</u>, 53 F.3d 1129 (10th Cir. 1995) illustrates the point.

> Ms. Aflleje–Torres argues the evidence is insufficient to support her conviction on count eight for money laundering. She claims the testimony of ... a DEA agent whose testimony implicated her in this crime, is inadequate to tie her to the

alleged money laundering. Specifically, while [the agent] testified as to a wire transfer from Irene Aflleje to Raymond Torres, neither her testimony nor the wire transfer make any mention of Barbara Aflleje–Torres. The government does not directly dispute this characterization of [the agent's] testimony, but argues that Ms. Aflleje–Torres is nonetheless responsible for this alleged act of money laundering because at that time, she was acting in concert with her husband Raymond Torres to distribute drugs. The government also asserts that because Barbara Aflleje–Torres was the person who requested that Irene Aflleje make the wire transfers, her culpability is established as an aider and abettor. We disagree.

Count eight of the indictment in this case charged Barbara Aflleje–Torres and Raymond Torres with a substantive count of money laundering and with aiding and abetting the same; it did not charge conspiracy to money launder, a separate and distinct crime from the substantive offense of money laundering. Nonetheless, the government attempts to bootstrap Barbara Aflleje–Torres' involvement in a conspiracy to distribute methamphetamine into some type of vicarious liability for a substantive count of money laundering. We reject the unprecedented argument that simply because several individuals were involved in a conspiracy to distribute drugs necessarily implies liability for other offenses beyond the scope of the conspiracy itself. While the government's theory

---

**29.** There is no need to dwell at length on the government's misstatement, inexplicable though it is, but it is worth noting that the absence of any money laundering charge in the <u>Smith</u> case is especially significant in light of the government's meritless attempt in this case to persuade the court that substantive money laundering should be treated, in es-

sence, as a derivative crime—an appendage, for venue purposes, of the underlying unlawful activity. "[T]he Government is not permitted to piggyback the faulty venue of the money laundering counts by latching them onto the [gambling] counts that are properly before the court." <u>Mikell</u>, 163 F.Supp.2d at 739.

might be plausible if the defendants had been charged with conspiracy to money launder, the indictment in this case does not make such an allegation. Therefore, we hold Ms. Aflleje–Torres'. conviction cannot be sustained on this ground.

53 F.3d at 1137–38.[30]

To the extent that the government relies on the fact that, in the substantive money laundering courts, the defendants are also charged as aiders and abetters, it is sufficient to note that, although having been ordered to do so (*see*, Part IV (B), above), the government has not stated how or when any of the defendants participated as aiders and abetters [31] in effecting a transfer of the laundered funds out of the Western District of Oklahoma. To the extent that the government relies on the fact that these defendants are charged as aiders and abetters in Counts 2 and 3 (illegal gambling business and conspiracy to commit money laundering), that reliance amounts to a stark *non sequitur* for the reasons discussed above.

**F. The Tenth Circuit's treatment of commingling.**

As is discussed in Parts IV (A) and (C), above, the government relies heavily on a "commingling" theory to sustain venue in this district. The gist of that theory is that some of the money involved in the charged money laundering transactions must surely have originated with illegal gambling activity (Counts 1 and 2) in Oklahoma, thus satisfying the statutory prerequisite, for venue, that "the defendant participate[ ] in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(B).

The government's commingling theory is without merit for two reasons. First, although the court's conclusions in this order rest on statutory grounds, it must be noted that the government's commingling theory, which would permit these defendants to be prosecuted on the money laundering counts in any one of forty states, rests on contacts with this district that are so theoretical and attenuated that the Supreme Court's admonition in Johnson (*see*, Part V (A), above), to say nothing of its holding in Cabrales, completely undermine the notion that venue in this district could rest on such a slender reed.

Secondly, as a statutory matter, the government's commingling theory seeks to apply, to the noticeably tight language of § 1956(i)(1)(B), an interpretation of the noticeably loose language of § 1957, as that section was applied by the Tenth Circuit in United States v. Johnson, 971 F.2d 562 (10th Cir. 1992). Citing Johnson and United States v. Wittig, 425 F.Supp.2d.1196 (D. Kan. 2006), *rev'd on other grounds sub nom.* United States v. Lake, 472 F.3d 1247 (10th Cir. 2007), the government argues that criminal liability for money laundering may be established under § 1957 even though tainted funds may have been commingled with untainted funds. Doc. no. 693, at 8. True enough. The relevant statutory language clearly demonstrates why that is of no consequence in the case at bar.

Section 1957(a) criminalizes transactions in "criminally derived property," defined in

**30.** To echo the Court's words in Cabrales, the "counts at issue" in the case at bar are substantive money laundering counts. Venue is not challenged as to Count 3—conspiracy to commit money laundering. The fact that these moving defendants are also charged with conspiracy to commit money laundering does not affect the analysis with respect to venue on Counts 4–16.

**31.** The court assumes, without deciding, that aiding and abetting a laundering transaction from afar could constitutionally suffice as a basis for venue in this district.

§ 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense." "Proceeds" means "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9), as incorporated by § 1957(f)(3). Given the purpose of § 1957, it comes as no surprise that the Court of Appeals has declined to "allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime. This would defeat the very purpose of the money-laundering statutes." Johnson, 971 F.2d at 570.

But if there had been a venue issue in Johnson (there was not), and if that venue issue had involved a money laundering charge based on an out-of-district transaction, the court would have had to determine whether "the defendant participated in *the* transfer of *the* proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." § 1956(i)(1)(B) (emphasis added). This language, tightly drafted and first proposed soon after Cabrales was handed down,[32] simply leaves no room for the expansive interpretation that was invited by the operative language of § 1957, as recognized by the Court of Appeals in Johnson.[33] Likewise, the passage from Wittig quoted by the government (doc. no. 693; at 8) addresses commingling for purposes of substantive criminal liability, not for venue purposes. Wittig, 425 F.Supp.2d at 1221. The venue issue in Wittig was resolved on the basis of facts the government does not have in the case at bar: the defendant *himself* acquired the laundered asset in the District of Kansas and transferred it

---

**32.** *See*, Jennifer Herring, Note, *Selecting an Appropriate Venue for Money Laundering Prosecutions*, 69 Geo. Wash. L. Rev. 293, at 307 n. 109 (2001).

**33.** It should also be noted that even if the Johnson interpretation of § 1957 could be applied to § 1956(i)(1)(B), the commingling that was countenanced in Johnson has little resemblance to the commingling proposed by the government in the case at bar. The issue in Johnson was whether the funds coming out of the defendant's account could be found to have been proceeds of fraud when the evidence did not completely exclude the possibility that about $66,000 of $5.5 million deposited into the defendant's account came from non-criminal activities. 971 F.2d at 570. In contrast, in the case at bar, the court assumes, for present purposes, that *all* of the funds involved in the charged substantive money laundering transactions were the proceeds of specified unlawful activity occurring at various times in any combination of forty states (as the government asserts). The "taint" that was good enough to establish criminal liability in Johnson—all but 1.5 percent of the deposited funds proven to be criminal proceeds—is a far cry from the taint that the government would have the court apply for venue purposes in the case at bar on the theory that some of those funds presumably were sent from Oklahoma (among forty other states) to Panama before they even became identifiable with any of the charged money laundering transactions. (To simplify the discussion of this issue, the court disregards the fact that, with respect to the funds involved in the substantive money laundering counts against Spiros Athanas, any connection with this district is even more attenuated. *See*, note 25, above.) Finally, on this point, it should not be forgotten that (as discussed in Part IV (B), above) the government has expressly declined, as to all of Counts 4—16, to provide anything more than a very general preview of its commingling theory. The government, though ordered to do so, has declined to provide particulars as to (i) how and when the laundered funds were transferred from this district to the district where the laundering transaction occurred, (ii) how each defendant participated in the transfer, and (iii) how and when each defendant participated as an aider and abetter in the transfer of funds from this district. Thus, the commingling theory, meritless as a matter of law, is also not supported by any facts the government has been willing to disclose.

*himself* from that district to New York, where the charged transaction occurred. *Id.* at 1220.

## VI.

### Conclusion

The court concludes that the Western District of Oklahoma is not a permissible venue for Counts 4–16 of the Superseding Indictment. The motions to dismiss, by Bartice A. King at doc. no. 703, Serena Monique King at doc. no. 701, Starting 5, LLC at doc. no. 704, Spiros G. Athanas at doc. no. 700 and William J. Bates at doc. no. 699 are, accordingly, **GRANTED**. Counts 4–16 are **DISMISSED**.[34]

---

**34.** Athanas asserts that 18 U.S.C. § 1956(i), the statute governing venue under 18 U.S.C. § 1957, is facially unconstitutional or unconstitutional as applied in this case. Doc. no. 700, at 12—14. Because the non-constitutional arguments advanced by Athanas and the other movants have carried the day, it is not necessary to address the constitutional issue. "[I]f it is not necessary to decide more, it is necessary not to decide more." PDK Laboratories Inc. v. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J. concurring).